

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-14-00283-CV

———————————————

JERRY V. DURANT; JERRY DURANT, INC. D/B/A DURANT TOYOTA AND
D/B/A JERRY DURANT TOYOTA; JERRY DURANT HYUNDAI, LLC; DOYLE
MAYNARD; ROBERT G. COTE SR.; GARY MICHAEL DEERE; JERRY RASH;
AND ELLIOT "SCOOTER" MICHELSON, Appellants

V.

ANDREW ANDERSON, Appellee

On Appeal from the 153rd District Court
Tarrant County, Texas
Trial Court No. 153-257626-12

---

Before Gabriel and Bassel, JJ.[1]
Memorandum Opinion on Remand by Justice Gabriel

---

[1]Justice Pittman was a member of the original panel but has since resigned. This case was decided by the two remaining justices. *See* Tex. R. App. P. 41.1(b).

**MEMORANDUM OPINION ON REMAND**

## I. SUMMARY INTRODUCTION

Appellee Andrew Anderson was a highly placed employee in appellant Jerry V. Durant's car-dealership empire, consisting of several Toyota, Hyundai, and General Motors dealerships in the Dallas–Fort Worth metroplex (Auto Group). Durant orally offered Anderson a 10% ownership interest in Auto Group's two underperforming Granbury dealerships—a Toyota dealership and a Hyundai dealership (the Granbury dealerships)—if Anderson would leave Durant's Weatherford dealership and manage the underperforming ones. Anderson accepted. Less than one year later, Anderson was out of a job and he sued Durant and the Granbury dealerships for breach of contract and fraudulent inducement. He asserted a defamation claim against Durant, multiple Auto Group employees, and several non-employees for statements they allegedly made regarding the reason Anderson no longer worked for Auto Group. After a seven-week jury trial, the jury found in favor of Anderson on his fraudulent-inducement and defamation claims but not on his breach-of-contract claim. The trial court entered judgment on the jury's awarded damages for Anderson's loss of the benefit of Durant's oral offer, past and future reputational injuries, past and future mental anguish, and past and future lost income.

We reversed the trial court's judgment, concluding that (1) the fraud recovery could not stand because the jury had found there was no breach of contract and (2) the evidence of defamation damages was legally insufficient. *Durant v. Anderson*,

2

No. 02-14-00283-CV, 2016 WL 552034, at \*3–8 (Tex. App.—Fort Worth Feb. 11, 2016) (mem. op.). The Supreme Court agreed that some of the awarded defamation damages—past and future lost income, future mental anguish, and future reputational damage—were not supported by legally sufficient evidence. *Anderson v. Durant*, 550 S.W.3d 605, 621, 623–24 (Tex. 2018). But the Court found legally sufficient evidence to support the remainder of the defamation damages and concluded that because the fraud question in the jury charge incorporated the required elements of a contract, Anderson was entitled to recover benefit-of-the-bargain damages for fraudulent inducement. *Id.* at 615–17, 619–25. The Court remanded all unaddressed issues to this court. *Id.* at 623 n.95, 624 & n.101.

As an intermediate appellate court, we are tasked with determining legal and factual questions. We look at legal questions de novo. In other words, it is what it is. But we look at factual questions through a deferential lens and are barred from second-guessing a jury's resolution. Here, as in most cases, the standards and scopes of our review dictate the outcome. Although all parties discordantly argue the import of the facts adduced at trial, we must be mindful of the deference we give to a jury's determination of factual issues, the trial court's discretion, and our duty to ensure the applicable legal precepts were correctly submitted. Relying on these boundaries and on the Supreme Court's explicit instructions, we affirm the trial court's judgment regarding Anderson's fraudulent-inducement claim. *See* Tex. R. App. P. 43.2(a). But these same standards dictate that we must reverse the trial court's judgment regarding

one employee's defamation liability, rendering a take-nothing judgment as to that employee. *See* Tex. R. App. P. 43.2(c). Based on our conclusion that the amounts of Anderson's remaining general defamation damages are supported by factually insufficient evidence, we suggest a remittitur. *See* Tex. R. App. P. 46.3. The response to this suggested remittitur dictates whether we will affirm the defamation judgment as modified or whether we will reverse the defamation judgment regarding the remaining defendants' liability and remand for a new trial on liability and on those damages supported by legally sufficient evidence. *See* Tex. R. App. P. 43.2(b), (d), 43.3, 46.3.

## II. BACKGROUND

The underlying facts have been exhaustively recounted by the Supreme Court, by this court, and by the parties in over 500 pages of briefing. Because some claims have been disposed of by this court or by the Supreme Court, we necessarily will discuss the facts in light of the issues presented to us on remand and in light of the facts as found by the jury. And in the interest of coherence, we will describe here the events in broad brushstrokes, saving the minutiae for the relevant substantive discussion.

### A. GENERAL FACTUAL BACKGROUND

#### 1. Anderson's Rise

In 2001, Anderson began working for Auto Group as the used-car manager at Durant Nissan in Weatherford. Anderson received several promotions and in 2006,

4

he was named the general manager of all but one of Auto Group's dealerships in Weatherford.[2] Anderson also was named to Auto Group's board of directors. The Supreme Court noted that Anderson's career "flourished" while he was employed by Auto Group. *Anderson*, 550 S.W.3d at 610.

In February 2011, Durant asked Anderson to leave his position in Weatherford to become the general manager of the Granbury dealerships, which historically underperformed. "[I]n exchange" for his promise to leave his "relatively [more] secure position" in Weatherford, Anderson averred that Durant offered him a 10% ownership interest in the Granbury dealerships and a 10% ownership interest in the real property associated with those dealerships. *Id.* Durant asserted that his offer was conditional—if Anderson accepted the position and if the Granbury dealerships met a $400,000 net-profit threshold, Anderson would have the option to buy the offered ownership interest.

In any event, Anderson accepted the oral offer and became the general manager of the Granbury dealerships shortly thereafter. An article appeared in the Hood County News in May 2011, announcing that Anderson had been named "General Manager and Partner/Principle" of the Granbury dealerships. Durant was quoted in the article as saying Anderson had been named "General Manager and

---

[2]Anderson was not the general manager of Auto Group's Weatherford Toyota dealership.

Partner" of the Granbury dealerships. This same language was used in a press release and a marketing brochure for the Granbury dealerships.

## 2. Anderson's Fall

In December 2011, Durant and Don Allen, the president of Auto Group, reached an agreement to sell Auto Group's dealerships for $44 million to Pat Lobb.[3] Durant announced the deal to the general managers at a December 8 meeting and stated that anyone with a buy-in agreement would be "taken care of." Anderson believed this meant that he "would get [his] 10 percent of the two Granbury stores."

On December 15 at the Christmas party for Auto Group's Weatherford employees, Anderson and two other managers with written ownership agreements—Kevin Reeves and Gary Burdick—were each given $75,000. Durant later argued that the money was in lieu of the promised ownership interest in the Granbury dealerships. Anderson believed it was a year-end bonus for good performance. Indeed, other employees who did not have a promised ownership interest in any of Auto Group's dealerships received significant sums at the party. Reeves and Burdick believed the checks were buy outs of their ownership interests.

Shortly after December 15, Durant received a tip from another car dealer that he should "[c]heck" his inventory. Durant, knowing that there was a problem with used cars sitting on the Granbury dealerships' lots too long, contacted Allen about the problem. Allen tasked David Risinger, Auto Group's general manager for used cars,

_____

[3]The sale fell through in March 2012.

with auditing the Granbury dealerships' inventories. Risinger reported to Durant that the used cars at the Granbury dealerships were worth $375,000 less than what had been paid for them. Durant surmised from this information that Anderson had been buying used cars from a wholesaler, Pro Financial Company, paying more for them than they were worth, and taking money—kickbacks—from the wholesaler for doing so. Durant told appellant Robert G. Cote Sr., Auto Group's vice president of finance, "[G]o down there and see where the cars come from."

On Christmas Day, Durant met with appellant Doyle Maynard, the general sales manager for the Granbury Toyota dealership, whose direct supervisor was Anderson. Maynard informed Durant that he had had concerns about the price paid for and the condition of the used cars Anderson had bought from Pro Financial and that he had previously raised those concerns to Anderson to no avail. Maynard told Durant that "something wrong might be going on" because "when [Maynard] smell[s] something, there's usually something there. And [he] was smelling it."

On December 26 at a meeting with the used-car managers, Durant publicly criticized Anderson for his used-car inventory and for buying cars from Pro Financial after Durant had previously denied Anderson's request to do so. Later that day, Durant and Anderson met in Durant's office. Durant again expressed his displeasure with Anderson. At around this same time, Cote reported to Durant that his investigation had revealed that Anderson had bought fifteen cars directly from Pro

7

Financial. Durant told Cote that it appeared Anderson was taking kickbacks from Pro

Financial.

On December 28, Anderson met with Durant and Cote, and Durant told

Anderson that Durant had "reliable sources" that Anderson had "taken kickbacks on

these cars." Durant then asked Cote to read a polygraph-consent form to Anderson

that detailed the accusations:

> A cursory review of all transactions with Pro Financial disclosed that a total of 15 used vehicles were purchased by you at wholesale from Pro Financial Company . . . .
>
> You had complete control and responsibility over the used vehicle transactions in question and also for managing the stores in Granbury that resold the units in question.
>
> It has been alleged that the prices you agreed to pay for the vehicles in question were more than expected and a recent independent appraisal of these vehicles has indicated that. It has also been alleged that you may have received wrongful compensation from Pro Financial which may not have been in the best interest of the company.
>
> You have denied wrongdoing in these transactions. You have also indicated a willing[ness] to take a polygraph examination to clear yourself of suspicious wrongdoing.
>
> . . . **We hereby request you to submit to a polygraph examination due to:**
>
> You are suspected of receiving compensation that was not in the company's best interest and that resulted in the company losing about $30,856. You were responsible for managing . . . Auto Group's Southern operations and had complete control and overall management responsibilities over buying and selling the vehicles that resulted in the loss.

At trial, Durant testified that Anderson volunteered to take the polygraph and that Durant was convinced Anderson would not fail even though Durant believed that Anderson was "doing wrong or . . . being a poor car man and paying that much for those cars."

The results of Anderson's January 4, 2012 polygraph exam were inconclusive, and Anderson met with Durant and Allen later that same day. Anderson told Durant that his own audit showed no losses on the disputed transactions and asked for proof of his alleged wrongdoing. Allen responded, "It's not about proof." Durant asked Anderson to pay $30,856 to cover Auto Group's alleged losses on the 15 cars and told Anderson that if he refused, he could "hit the dirt." Although Anderson initially was receptive to paying for the alleged losses, Anderson changed his mind and hit the dirt, never to return.

The Supreme Court noted that because "[t]he car-selling industry [is] a small and close-knit community, rumors quickly spread about Anderson's termination and the accusations that he had accepted kickbacks." *Anderson*, 550 S.W.3d at 612. Anderson also discussed the kickback allegations with others in the community, including "a few personal friends" and "prospective employers." *Id.* Soon after Anderson left Auto Group, Jason Hiley, the owner of Hiley Autoplex, interviewed Anderson to be the dealership's general manager because Anderson had been "highly recommended." But after Hiley began talking to another candidate and after Hiley "heard some rumors" about why Anderson left Auto Group, Hiley did not "take it

9

any further." Hiley denied that he heard the rumor from anyone inside Auto Group. However, Hiley stated that Anderson recounted a "bad conversation" he had had with Durant and that Anderson mentioned Durant had promised Anderson "some ownership [interest] or something in one of the dealerships." Nine months after Anderson left Auto Group, Anderson found employment at Frank Kent Honda as its used-car manager—a significant step down from his prior position at Auto Group.

## B. PROCEDURAL BACKGROUND

### 1. Trial

Shortly after he left Auto Group, Anderson filed suit against Durant and the Granbury dealerships for fraudulent inducement and breach of contract. He also raised a defamation per se claim against Durant, Cote, Maynard, appellant Gary Michael Deere, appellant Jerry Rash, and appellant Elliot "Scooter" Michelson for their alleged roles in starting or spreading the kickback rumors. Anderson sought damages, including exemplary damages, and attorney's fees.

The jury found that although Durant, acting individually and on behalf of the Granbury dealerships, did not breach the alleged oral contract to immediately provide Anderson with a 10% ownership interest in the Granbury dealerships and the associated real estate, Durant committed fraud against Anderson through a material misrepresentation that Anderson relied on to his detriment.[4] The jury awarded

---

[4]As recognized by the Supreme Court, the fraud question in the jury charge tracked the Texas Pattern Jury Charge. *Id.*

Anderson $383,150 for the lost 10% ownership interest in the Granbury dealerships—$323,150 for the Toyota dealership and $60,000 for the Hyundai dealership—but the jury specifically rejected any recovery for the value of a 10% interest in the Granbury dealerships' associated real estate.

Regarding defamation, the jury found that Durant, Cote, Maynard, Deere, Rash, and Michelson published a statement that Anderson "was involved in taking kickbacks," which was defamatory and not substantially true. According to the jury, all should have known, in the exercise of ordinary care, that the kickback statement was false. Although the jury found that Durant and Cote made the statement in the scope of their authority and were privileged to make it, the jury also found that they made the statement knowing it was false or with a high degree of awareness that it was probably false based on serious doubts as to its truth. But the jury also found that Maynard was not acting in the scope of his employment and that he was not protected by privilege. The jury calculated Anderson's defamation damages to be $1.6 million: $400,000 each for past injury to his reputation, future injury to his reputation, past mental anguish, and future mental anguish. Except for Durant, who was apportioned the lion's share of responsibility for these damages, the remaining defendants were determined to be between 1% and 5% responsible. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a). Anderson was found to have been 0% responsible.

The trial court entered judgment on the jury's verdict and denied each defendant's motion for judgment notwithstanding the verdict. In awarding the defamation damages, the trial court apportioned each defendant's percentage of responsibility in the percentages found by the jury. Based on his large percentage of responsibility—85%—Durant was adjudged to be jointly and severally liable for the entirety of Anderson's defamation damages. *See id.* § 33.013(b)(1). The defendants' motions for new trial were overruled by operation of law. Durant and the Granbury dealerships filed an apparently ineffective supersedeas bond in an attempt to suspend enforcement of the judgment.[5] *See id.* § 52.006(a); Tex. R. App. P. 24.1(b). Maynard, Cote, and Rash filed uncontested affidavits reflecting that their respective net worths were "less than $0.00." *See* Tex. Civ. Prac. & Rem. Code Ann. § 52.006(b); Tex. R. App. P. 24.2(a)(1), (c).

## 2. Appeal

In the appeal from the trial court's judgment on the jury's verdict, we held that the jury's finding of no breach of contract precluded any recovery for fraud. *Durant*, 2016 WL 552034, at *3. We also concluded that there was no evidence of defamation damages. *Id.* at *4–8.

The Supreme Court held that because the fraudulent-inducement jury question encompassed the required elements of a contract, the jury's finding of no contract

---

[5]Although Anderson challenged the sufficiency of Durant and the Granbury dealerships' bond, the trial court did not rule on the motion, and the trial court clerk apparently did not approve the bond. *See* Tex. R. App. P. 24.1(a)(2).

12

breach did not foreclose a fraudulent-inducement recovery for the lost benefit of the bargain. *Anderson*, 550 S.W.3d at 614–17. And the Supreme Court concluded that the evidence was legally sufficient to support the jury's finding "that the parties struck a bargain for a ten-percent interest in the dealerships alone, and no jury findings render that promise unenforceable." *Id.* at 615. In summarizing its holding, the Supreme Court stated that "the jury findings are sufficient to support a finding of fraudulent inducement because the fraud submissions incorporate the necessary elements for recovery, including an enforceable promise, the existence of which is supported by legally sufficient evidence." *Id.* at 617.

Similarly, the Supreme Court found legally sufficient evidence that Anderson "suffered compensable mental anguish" in the past. *Id.* at 620. But the Supreme Court expressed doubt regarding the amount of those damages, noting that the awarded $400,000 "appears to be excessive." *Id.* The Court agreed with our holding that no evidence supported an award for future mental anguish. *Id.* at 621. The evidence of past injury to Anderson's reputation was found to be legally sufficient; the evidence of future impairment was not. *Id.* at 621, 623. The Supreme Court again noted the apparent excessiveness of the past reputational damages. *Id.* at 623. Finally, the Supreme Court found legally insufficient evidence supporting a special damages award—past and future lost income—for defamation. *Id.* at 623–24.

In remanding the case to this court, the Supreme Court clearly stated that its remand was not limited in scope, with the exception of the two issues it expressly

13

determined: (1) the effect of the jury's no-breach-of-contract finding on Anderson's fraudulent-inducement claim and (2) the legal sufficiency (or insufficiency) of the evidence to support the defamation damages. *Id.* at 624. The Supreme Court pointed out some of the remaining issues remanded to us:

> [S]ufficiency of the evidence to support the jury's findings of a material misrepresentation and detrimental reliance on the fraudulent-inducement claim; whether the defamatory statements constituted defamation per se, consisted of verifiable facts as opposed to opinion, or were made with actual malice or pursuant to legal privilege; excessiveness of the surviving damages awards; and alleged jury charge error.

*Id.* at 624 & n.101. The Supreme Court specifically stated that this list was not an exhaustive one, and we will be guided by the parties' briefing on remand to determine the specific issues we are asked to address. *See id.* at 624.

## III.  FRAUDULENT INDUCEMENT

Durant and the Granbury dealerships (collectively and in the singular, Durant) argue that the evidence is legally and factually insufficient to show key elements of a fraudulent-inducement claim. Durant also argues that the jury charge was erroneous in certain respects.

### A.  JURY-CHARGE ARGUMENTS

Because Durant's sufficiency arguments are measured by the jury charge, we will address his jury-charge issues first. *See Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 407–08 (Tex. 2016); *see also Anderson*, 550 S.W.3d at 623 n.95 (instructing this court to

address defamation jury-charge issues "before determining whether the evidence regarding the source of particular rumors is deficient").

## 1. Definition of Misrepresentation

First, Durant contends that the trial court erred by listing, in the definition of misrepresentation, statements based on opinion, which he argues were not supported by pleading or proof.[6] In the question asking whether Durant committed fraud against Anderson (Question 9), the trial court instructed the jury in the disjunctive on five definitions of a misrepresentation, three of which involved statements of "opinion": a false statement of fact, a promise of future action made with the intent not to perform as promised, a statement of opinion based on a false statement of fact, a statement of opinion that the maker knows to be false, or an expression of opinion that is false and made by one claiming or implying to have special knowledge of the subject. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business* PJC 105.3A–105.3E (2018). No party disputes that Anderson's

---

[6]Anderson asserts that Durant failed to raise this argument in the trial court and has changed his argument from that raised on original submission. In the trial court, Durant objected to the misrepresentation definition "with respect to statements of opinion . . . because there's no pleadings or evidence to support a statements of opinion theory in this case." On original submission to this court, Durant argued that the definition of misrepresentation improperly "instruct[ed] the jury to consider an invalid theory or basis of fraud" by including misrepresentations based on statements of opinion. Although Durant on remand has honed his argument and cited additional authorities, he sufficiently raised the definitional issue to the trial court and in this court. *See* Tex. R. App. P. 33.1(a), 38.9; *Comm'n for Lawyer Discipline v. Cantu*, 587 S.W.3d 779, 782 (Tex. 2019) (per curiam) ("Cantu's trial-court arguments expressed the basic rationale for the objection without citing the case law. This does not prevent him from relying on the case law on appeal.").

15

fraudulent-inducement claim was factually based only on Durant's false promise of future performance made with the intent to not perform—not on a statement of opinion. *See generally Anderson*, 550 S.W.3d at 617 (noting that the jury found in the liability and damages questions regarding fraudulent inducement that Durant had made "a promise of future performance").

Although we review alleged definitional charge error for an abuse of discretion, *see Seger*, 503 S.W.3d at 407–08, we start with a discussion of harm in this case. *See* Tex. R. App. P. 44.1(a). Durant argues that harm is presumed because the misrepresentation definition included unpleaded and unsupported recovery bases. *See Benge v. Williams*, 548 S.W.3d 466, 475–76 (Tex. 2018); *cf. Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000) (recognizing erroneous submission of multiple valid and invalid theories of liability in one broad-form question is harmful if "it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding"). But even under the presumed-harm rule, we may presume harm only if we cannot determine with reasonable certainty whether the jury based its answer on the submitted, but invalid, factual bases supporting a single liability recovery. *Benge*, 548 S.W.3d at 475–76; *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 227–28 (Tex. 2005); *see also Casteel*, 22 S.W.3d at 388; *accord Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir. 1984), *quoted in Romero*, 166 S.W.3d at 227–28. In this case, we are able to make that determination with reasonable certainty.

16

In Question 10, the jury was asked to find the amount of damages Anderson incurred as a result of Durant's fraud, which had been found in Question 9. The submitted measures of damages were the values of a 10% ownership interest in the Granbury dealerships and in the associated real estate, which Anderson alleged was Durant's promise of future performance that he made with no intent to keep. In other words, the jury was asked to determine only Anderson's benefit-of-the-bargain damages based on Durant's promise.[7] *See Anderson*, 550 S.W.3d at 615 (recognizing jury awarded Anderson benefit-of-the-bargain damages based on Durant's fraudulent promise of future performance). Such damages applied to the factual basis that Anderson had pleaded and proved—a promise of future performance made with an intent not to perform—and could not have referred to a misrepresentation based on an unidentified statement of opinion. *See id.* at 617. An opinion statement would not have involved a promised bargain or the value of its lost benefit.

The Supreme Court recognized that the jury necessarily found that Durant's misrepresentation was a promise of future performance. *Id.* We are also reasonably certain, based on the context of Questions 9 and 10 and based on the fact that Anderson focused his pleadings and proof solely on Durant's promise of future performance, that the jury did not base its fraudulent-inducement findings on the misrepresentation definitions regarding statements of opinion. *See Island Recreational*

_____

[7]Benefit-of-the-bargain damages in the misrepresentation context measure "the difference between the value as represented and the value received." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (op. on reh'g).

17

*Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986) (op. on reh'g) ("To determine whether an alleged error in the jury charge is reversible, the reviewing court must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety."); *cf. Anderson*, 550 S.W.3d at 614 ("Because fraudulent inducement arises only in the context of a contract, the existence of a contract is an essential part of its proof."). Accordingly, Durant was not harmed by the disjunctive definitions of misrepresentation based on statements of opinion, which were not a part of Anderson's fraudulent-inducement claim.[8] *See Panhandle Steel Erectors, Inc. v. Cantu*, No. 05-17-01495-CV, 2019 WL 3214147, at *10 (Tex. App.—Dallas July 17, 2019, pet. filed) (mem. op.); *accord Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 878 n.4 (5th Cir. 2013) (dictum); *Muth v. Ford Motor Co.*, 461 F.3d 557, 564–65 (5th Cir. 2006).

### 2. Absence of Fair-Market-Value Instruction

Second, Durant argues in a conclusory manner that the trial court erred by "failing to charge the jury to determine fair market value."[9] In Question 10, the

---

[8]Again, we do not address whether the definition of misrepresentation was, in fact, an abuse of discretion.

[9]Anderson argues that Durant waived this argument as a result of his bare-bones briefing of the issue. Based on Durant's objection to the charge and his inclusion of an isolated sentence in his brief, we can divine the gist of his argument. *See St. John Missionary Baptist Church v. Flakes*, No. 18-0513, 2020 WL 593694, at *4 (Tex. Feb. 7, 2020) (per curiam); *Cantu*, 587 S.W.3d at 781–82. But we need not belabor the point in the absence of targeted, substantive briefing. *See Horton v. Stovall*, 591 S.W.3d 567, 570 (Tex. 2019) (per curiam); *Ridge Nat. Res., L.L.C. v. Double Eagle*

18

charge instructed the jury to determine the "value" of Anderson's ownership interest in the Granbury dealerships and associated real estate and informed the jury that "[v]alue must be determined at the time of the breach, if any."[10]    Durant unsuccessfully objected that these damages were "not limited to the fair market value for those particular elements."  Durant fails to explain why the exclusion of the words "fair market" in Question 10, in light of the evidence of the Granbury dealerships' fair-market value, is reversible; and it does not appear to be so.  *See, e.g., O.C.T.G., L.L.P. v. Laguna Tubular Prods. Corp.*, 557 S.W.3d 175, 190–91 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

As we will discuss more fully in our sufficiency analysis, Anderson's and Durant's damage experts both testified to the fair market value of a 10% interest in the Granbury dealerships and the associated real estate.  Their opinions diverged as to how the fair-market-value number was derived, not as to whether fair-market value was the appropriate yardstick.  The evidence before the jury consisted of differing fair-market values for the Granbury dealerships and the associated real estate.

*Royalty, L.P.*, 564 S.W.3d 105, 126 (Tex. App.—El Paso 2018, no pet.).  We conclude supplemental briefing would not aid this court, especially in light of the more than 500 pages of briefing we have already been provided.  *See St. John*, 2020 WL 593694, at *4.

[10]In a later question regarding the Granbury Hyundai dealership's breach-of-fiduciary-duty counterclaim against Anderson and that dealership's sales manager, the trial court defined "fair market value" as "the price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it."

Although Durant argues that Anderson's expert testified to enterprise value, which is an alternate method to value a minority shareholder's stock, Anderson's expert testified that his valuation opinion was a fair-market valuation under the terms of Durant's promise. Based on the state of the record, the trial court's reference to "value" necessarily referred to fair-market value. As such, the absence of the fair-market adjective in the valuation question was not an abuse of discretion. *See id.*; *see also* Tex. R. Civ. P. 278 ("A judgment shall not be reversed because of the failure to submit other and various phases or different shades of the same question.").

## B. SUFFICIENCY ARGUMENTS

Durant contends that the evidence is legally and factually insufficient to show either a material misrepresentation or Anderson's justifiable reliance, both essential elements of a fraudulent-inducement claim. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496–97 (Tex. 2019); *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 557 (Tex. 2019) (quoting *Anderson*, 550 S.W.3d at 614). Durant also asserts that the evidence of an enforceable promise is factually insufficient and attacks the legal and factual sufficiency of the evidence to support the fraudulent-inducement, benefit-of-the-bargain damages.

### 1. Standards and Scopes of Review

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the

20

only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016); *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (per curiam) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider only the evidence tending to support the finding and must disregard contrary evidence unless it is conclusive. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 859 (Tex. 2017). Both direct and circumstantial evidence may be used to establish any material fact. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). This review is not as restrictive in scope as a legal-sufficiency review, but remains deferential to found facts that are supported by the weight of the evidence. *Jelinek v. Casas*, 328 S.W.3d 526, 538 (Tex. 2010); *Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744–45 (Tex. 1986).

## 2. Enforceable Promise: Factual Sufficiency

An enforceable agreement is an essential part of a fraudulent-inducement claim. *See Anderson*, 550 S.W.3d at 614; *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 152 (Tex. 2015); *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). Durant argues that the jury's implicit finding of an enforceable promise, which was subsumed into its fraud finding against Durant, was supported by factually insufficient evidence.[11] Durant contends that the offer was expressly conditioned on Anderson meeting a net-profit threshold before his buy-in option was triggered, as evidenced by the buy-in agreements signed by Reeves and Burdick "around the same time" as Anderson's oral agreement with Durant. Both Reeves and Burdick testified that they discussed, at least superficially, the net-profit condition with Anderson and that they knew the $75,000 Christmas payment was not a bonus but was given in place of the conditional ownership interest. They also testified that their promised, conditional ownership interest involved only the dealerships, not the associated land. Durant also points to evidence that any ownership change was required to have been approved by the manufacturer.

Durant contends that the weight of this evidence compelled the jury to find that Durant did not promise Anderson an immediate ownership interest but promised a conditional ownership interest once Anderson met certain benchmarks, including

---

[11]Durant recognizes that the Supreme Court found the evidence legally sufficient on this issue. *See Anderson*, 550 S.W.3d at 610.

meeting a high net profit for the Granbury dealerships. Anderson testified that the $75,000 check at the Christmas party "was very obvious[ly]" a Christmas bonus because of its timing and because 2011 had been Auto Group's "best year in 43 years." Durant was quoted in a newspaper article, a press release, and a marketing brochure prepared after Anderson began managing the Granbury dealerships that Anderson was a "Partner" in the Granbury dealerships.[12] Anderson testified that Durant promised him an immediate 10% interest in the Granbury dealerships and a 10% interest in the land.

In short, the evidence consisted of diametrically opposed versions of the terms of the agreement between Durant and Anderson. Such a he-said/he-said dispute does not constitute factually insufficient evidence. *See, e.g.*, *In re H.S.*, No. 02-17-00379-CV, 2018 WL 5832120, at *7 (Tex. App.—Fort Worth Nov. 8, 2018, no pet.) (mem. op.); *Scott v. Christian Methodist Episcopal Church*, No. 02-10-00434-CV, 2012 WL 42991, at *2–3 (Tex. App.—Fort Worth Jan. 5, 2012, no pet.) (mem. op.); *Brown v. Traylor*, 210 S.W.3d 648, 668–69 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Durban v. Guajardo*, 79 S.W.3d 198, 209 (Tex. App.—Dallas 2002, no pet.). A jury is entitled to choose which version it finds credible: "The jury could—and did—find both that (1) the evidence of a promise to convey ownership interests in both the dealerships and the land was unpersuasive but (2) the evidence of a promise to convey an

---

[12]There was some evidence that Durant was not the source of the quotes attributed to him; however, he never tried to correct them. *See Anderson*, 550 S.W.3d at 611.

ownership interest in the dealerships was credible." *Anderson*, 550 S.W.3d at 617.[13]

Here, there is some evidence to support the jury's finding of the terms of the agreement—specifically, Anderson's testimony—and we decline to disturb that finding in light of the entirety of the record. *See Cain*, 709 S.W.2d at 176; *Douglass v. Huntress*, No. 06-17-00103-CV, 2018 WL 4224898, at *7 (Tex. App.—Texarkana Sept. 5, 2018, no pet.) (mem. op.).

### 3. Material Misrepresentation and Justifiable Reliance

### a. Legal sufficiency

Durant argues that because the ownership promise was dependent on Anderson's continued at-will employment, it was not actionable as a matter of law because such a representation cannot be material and cannot result in justifiable reliance.[14] Durant's substantive argument directed to these elements is a pure legal one: A fraudulent-inducement claim cannot be based on a promise involving at-will employment "as a matter of law." *See generally Mercedes-Benz*, 583 S.W.3d at 558 ("Whether a party's actual reliance is also justifiable is ordinarily a fact question, but

---

[13]This holding directly contradicts Durant's argument that the jury could not "blend[] the evidence (accepting and rejecting bits and pieces of Anderson's and [Durant's] testimony)" because such evidence is "inherently weak." A jury's task is to weigh the evidence in determining a fact at issue, which necessarily involves choosing which version of the facts to credit.

[14]As Anderson points out, Durant fails to challenge the remaining elements of a fraudulent-inducement claim except for the existence of an enforceable contract. *See Anderson*, 550 S.W.3d at 614; *see also Barrow-Shaver*, 590 S.W.3d at 496–97 & n.11.

the element may be negated as a matter of law when circumstances exist under which reliance cannot be justified.").

"[B]ecause employment can terminate at any time[,] . . . an at-will employee cannot bring an action for fraud that is dependent on continued employment." *Sawyer v. E.I. Du Pont De Nemours & Co.*, 430 S.W.3d 396, 401–02 (Tex. 2014). As described by the Supreme Court, Durant promised Anderson a 10% ownership interest in the Granbury dealerships "in exchange for leaving a more secure management position." *Anderson*, 550 S.W.3d at 610. Durant relies on *Sawyer* and contends that because the agreement, at the time it was made, was conditioned on Anderson's continued at-will employment, it was illusory; thus, any misrepresentation was not material and Anderson could not justifiably rely on it. *Sawyer*, 430 S.W.3d at 401.

But employers and employees can form contracts after employment begins if neither party relies on continued employment as consideration for the contract. *Id.* at 400 (quoting *In re 24R, Inc.*, 324 S.W.3d 564, 566 (Tex. 2010) (per curiam) (orig. proceeding)); *see also Stancu v. Hyatt Corp./Hyatt Regency, Dall.*, No. 3:17-cv-675-S-BN, 2018 WL 4471786, at *10 (N.D. Tex. Aug. 28, 2018) (Maj. J. recommendation), *adopted*, 2018 WL 4471692 (N.D. Tex. Sept. 18, 2018), *aff'd*, 791 F. App'x 446 (5th Cir. 2019) (per curiam). The promise at issue here was not dependent on Anderson's continued employment, and Anderson's fraudulent-inducement claim was not based on a promise of continued employment. Both were based on Durant's promise to provide Anderson a 10% ownership interest in the Granbury dealerships. *See In re*

*Halliburton*, 80 S.W.3d 566, 568–69 (Tex. 2002) (orig. proceeding) (holding post-employment arbitration agreement not illusory because it "is not *dependent* on continuing employment. Instead, it was *accepted* by the employee's continuing employment"); *see also Sawyer*, 430 S.W.3d at 400 & n.18 (recognizing not all fraud claims are barred in the context of at-will employment); *cf. Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 302–04 (Tex. 2009) (holding unilateral, post-employment contract giving at-will employees portion of proceeds from sale of company if they remained employed, which they did, was enforceable contract because "what matters is whether the promise became enforceable by the time of the breach").

We reject Durant's argument that Anderson's at-will status mandates as a matter of law that the agreement could be neither material nor justifiably relied upon.[15] Accordingly, the jury was entitled to credit the evidence showing materiality and justifiable reliance—portions of Anderson's testimony about the terms of the agreement—which was more than a scintilla. *See Castillo*, 444 S.W.3d at 621–23; *cf. Lloyd Walterscheid & Walterscheid Farms, LLC v. Walterscheid*, 557 S.W.3d 245, 260 (Tex.

---

[15]We note that Anderson asserted at oral argument that we could infer the Supreme Court determined his at-will status—a legal issue—did not affect the legal sufficiency of the evidence to support justifiable reliance or a material misrepresentation. *Compare Anderson*, 550 S.W.3d at 616–17, *with id.* at 624. We recognize Anderson's argument but address the issue in light of the fact that the Supreme Court held that the "sufficiency of the evidence to support the jury's findings of a material misrepresentation and detrimental reliance on the fraudulent-inducement claim" were unaddressed issues for remand. *Id.* at 624 n.101.

App.—Fort Worth 2018, no pet.) (concluding some evidence supported trial court's implied finding that the material terms of the parties' bargain were not agreed to).

### b. Factual sufficiency

The entirety of Durant's factual-sufficiency argument on remand directed to these two elements of Anderson's fraudulent-inducement claim is cursory: "There is legally and/or factually insufficient evidence of a **material** misrepresentation [and] justifiable reliance." As we have noted, Durant's substantive, evidentiary argument focuses solely on the legal sufficiency of the evidence—Anderson had no claim for fraudulent inducement as a matter of law—based on Anderson's status as an at-will employee. But because Durant at least includes the words "factually insufficient" in his statement of the issue, we will briefly address it.[16] *See St. John*, 2020 WL 593694, at *4; *Horton*, 591 S.W.3d at 570; *Anderson*, 550 S.W.3d at 617; *Wichita Cty. v. Envtl. Eng'g & Geotechnics, Inc.*, 576 S.W.3d 851, 857–58 (Tex. App.—Austin 2019, no pet.); *Ridge Nat. Res.*, 564 S.W.3d at 121; *cf. Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006) (per curiam) (recognizing intermediate appellate court must clearly detail all the evidence if reversing based on factual insufficiency but need only provide "basic reasons" if overruling factual-sufficiency issue). *See generally Gierut v. Morrison*,

---

[16]In his original opening brief, Durant was similarly cursory in his factual-insufficiency arguments regarding these two elements, solely focusing on his argument that the claim was barred as a matter of law. With the exception of his briefing directed to the factual sufficiency of the evidence to show an enforceable promise or defamation damages, Durant consistently briefs factual sufficiency in a cursory manner. Supplemental briefing would not help under the circumstances of this appeal. *See St. John*, 2020 WL 593694, at *4.

No. 03-17-00326-CV, 2018 WL 6715470, at *4 (Tex. App.—Austin Dec. 21, 2018, no pet.) (mem. op.) (recognizing appellant must provide guidance to appellate court, including citations to authorities and the record). We will follow Durant's lead in the depth of detail we give to it.

A misrepresentation is material if a "reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). The trial court's jury charge similarly defined fraud. Anderson testified that the promised 10% ownership interest was material to his decision to accept the offer and manage the Granbury dealerships. In fact, he stated that ownership had been his career "end goal."

A fraudulent-inducement plaintiff acts in reliance on a material misrepresentation if he entered into an enforceable agreement because of the misrepresentation. *Wilmot v. Bouknight*, 466 S.W.3d 219, 229 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Anderson testified that he relied on the non-conditional ownership interest, an enforceable promise, in deciding to leave his more secure position in Weatherford.

We conclude that although Durant offered competing evidence on the two challenged elements, Anderson's testimony was factually sufficient to support the jury's finding that Durant made a material misrepresentation that Anderson justifiably relied on. *See id.* at 228–29; *cf. Durban*, 79 S.W.3d at 209 ("The jury chose to believe

28

Guajardo over Durban, and we must respect the jury's decision."). This evidence was not so weak that it was not worthy of belief. *See Miller v. Durham*, No. 07-14-00087-CV, 2014 WL 4101762, at *3–4 (Tex. App.—Amarillo Aug. 19, 2014, no pet.) (mem. op.); *Morrell v. Finke*, 184 S.W.3d 257, 282 (Tex. App.—Fort Worth 2005, pet. denied). In other words, the great weight and preponderance of all the evidence was in harmony with the jury's finding regarding fraudulent inducement.

## 4. Damages

Durant argues that the evidence was legally and factually insufficient to support the jury's damages finding attributable to Anderson's 10% ownership interest at the time of the alleged fraudulent inducement. The jury found that the value of the interest in the Granbury Toyota dealership was $323,150 and that the value of the interest in the Granbury Hyundai dealership was $60,000. Both of these amounts expressly "exclude[d] the value of the associated real estate." Durant includes as part of his sufficiency argument his assertion that the trial court abused its discretion by admitting the testimony of Anderson's damages expert, David Fuller. *See* Tex. R. Evid. 702.

### a. Valuation evidence

Fuller testified that in valuing Anderson's interest on the basis of fair-market value, he did not apply any discounts based on the interest's lack of marketability or Anderson's lack of control as a minority owner. A fair-market valuation frequently includes such discounts, *see Argo Data Res. Corp. v. Shagrithaya*, 380 S.W.3d 249, 271

29

(Tex. App.—Dallas 2012, pet. denied), but Fuller did not because he relied on Anderson's understanding of his agreement with Durant as not including a discount. Fuller relied on Allen's deposition testimony[17] and by the fact that the proposed sale price of Auto Group would not have been discounted. Fuller concluded that Anderson's 10% interest in the Granbury Toyota dealership, excluding the value of the land, was $646,300. He valued a 10% interest in the operations of the Granbury Hyundai dealership at $80,200. These valuations were computed as of January 4, 2012—the day Anderson "hit the dirt."

Fuller explained that his fair-market valuations were the result of the "income approach" and the "market approach":

> [T]he income approach, discounting the future income to present value; and the market approach, looking at market evidence of what similar companies would sell for. And then after coming up with a value for the entire business, I multiplied that by 10 percent to come up with a value for the operations of the [Granbury] dealership[s].

Fuller previously had used this method to value other car dealerships.

Durant's damages expert, James Penn, valued a 10% interest in the Granbury Toyota dealership at $151,500[18] and in the Granbury Hyundai dealership at $20,500. Penn applied the discounts Fuller had not and criticized Fuller's conclusions on this

---

[17]Fuller testified that Allen "described that you would determine the value of the entire business and then simply take 10 percent of that figure without applying any discounts for lack of control or marketability."

[18]Penn was equivocal on the Toyota valuation because he noted that it was a satellite of the Weatherford Toyota dealership and "not a separate entity."

basis. But Penn also calculated the valuation as of early 2012 (even though Durant claimed that the interest vested, if at all, in February 2011) "to be consistent" with Fuller.

### b. Admissibility of Fuller's expert opinion

In the trial court, Durant filed a motion and a supplemental motion to exclude Fuller's expert valuation opinion regarding the operations of the Granbury dealerships and argued that Fuller's methodology was unreliable because it was based on a false premise—that Anderson and Durant agreed to the valuation method for the Granbury dealerships to determine Anderson's 10% interest.[19] The trial court denied the motions. Before Fuller's trial testimony, Durant "renew[ed]" his objection to Fuller's "lack of reliability and methodology." The trial court did not rule on the objection but stated, "So noted."[20] On appeal, Durant again contends that because Fuller calculated Anderson's pro rata share of the Granbury dealerships without determining fair-market value with the appropriate discounts, his valuation methodology was not reliable, rendering his opinion inadmissible. *See* Tex. R. Evid. 702.

---

[19]Durant raised other challenges to the admissibility of Fuller's expert opinion in the trial court, but we will address only the argument he raises on remand.

[20]Although Durant did not get an express ruling on the record at trial, his pretrial motions to exclude preserved his reliability argument. *See Austin v. Weems*, 337 S.W.3d 415, 421–22 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

We review the trial court's admission of Fuller's testimony for an abuse of discretion. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006). Durant did not challenge Fuller's qualifications but rather pointed to Durant's disagreements with how Fuller arrived at his valuation numbers. Indeed, Durant extensively cross-examined Fuller about his reliance on Anderson's stated version of the alleged agreement with Durant, about Fuller's failure to consider discounts for lack of marketability and control, and about Fuller's representation that he had calculated fair-market value. Penn also testified why Fuller's conclusion was incorrect based on these alleged calculation mistakes. Fuller explained the bases of his opinion, which were more than his subjective interpretation of the facts. We conclude that Durant's exclusion arguments go to the weight to be given Fuller's opinion, not to its admissibility. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 40–41 (Tex. 2007); *Pena v. Ludwig*, 766 S.W.2d 298, 304 (Tex. App.—Waco 1989, no writ). Thus, the trial court did not abuse its discretion by admitting Fuller's testimony.

But even if Durant's exclusion arguments were directed to the admissibility of Fuller's opinion and not to its weight, we would conclude that his testimony was not impermissibly subjective and was sufficiently tied to the facts such that the trial court did not abuse its discretion by admitting Fuller's opinion evidence. *See TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239–40 (Tex. 2010); *Bazan v. Muñoz*, 444 S.W.3d 110, 121–22 (Tex. App.—San Antonio 2014, no pet.). *See generally Ledesma*, 242 S.W.3d at

32

39 (explaining unreliability based on objection to methodology in context of admissibility of expert opinion).

### c. Evidentiary sufficiency

Durant first argues that because Fuller did not apply discounts to his valuation of Anderson's interest in the Granbury dealerships, there is no or alternatively insufficient evidence of fair-market value. The jury heard that the Granbury and Weatherford Toyota dealerships, excluding any real property, were worth $4 million and that the Granbury Hyundai dealership was worth "probably $500,000." Fuller testified that he had calculated fair-market value, using market and income approaches, and Durant attempted to attack the credibility and weight of this opinion by pointing to the absence of discounts. Penn testified that Anderson's interest should be discounted 15% for lack of majority control and 25% for lack of marketability. In arriving at his fair-market valuation, Penn applied these discounts to Anderson's 10% ownership interest in the operations of the Granbury dealerships. This evidence constitutes more than a scintilla of evidence of the fair-market value of Anderson's ownership interest and was not so weak that the jury's damages findings should be set aside. The jury was entitled to award damages within the range of evidence presented at trial, which it did. *See Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 126–27 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Potter v. GMP, L.L.C.*, 141 S.W.3d 698, 704 (Tex. App.—San Antonio 2004, pet. dism'd); *Duggan v. Marshall*, 7 S.W.3d 888, 893 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

Durant also challenges the sufficiency of the damages evidence because the experts' valuations were not determined at the time of the alleged fraud—February 2011, when Durant offered Anderson a 10% ownership in the Granbury dealerships. The trial court charged the jury that the value of Anderson's damages "must be determined at the time of the breach."[21] The jury awarded Anderson benefit-of-the-bargain damages, *see Anderson*, 550 S.W.3d at 615, which are measured by the difference between the value as represented and the value received. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998) (op. on reh'g).

Benefit-of-the-bargain damages for misrepresentation or fraud are calculated "at the time of sale"—when they are incurred. *Arthur Andersen*, 945 S.W.2d at 817; *see Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 374 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *cf. Miga v. Jensen*, 96 S.W.3d 207, 213–15 (Tex. 2002) (holding contract damages for loss of stock interest measured at the time of breach and not when interest was promised). In other words, such damages permit the injured party to recover profits or other value that would have been received had the bargain been performed as promised. *Jang Won Cho v. Kun Sik Kim*, 572 S.W.3d 783, 806 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (op. on reconsideration) (citing *Zorrilla*, 469 S.W.3d at 153). Anderson's damages were not incurred until he "hit the dirt" in

---

[21]Durant does not separately challenge this instruction as an abuse of discretion.

34

January 2012 and was deprived of the ownership interest that Durant had promised ten months earlier. Accordingly, the evidence of Anderson's damages at the time his damages were incurred was legally and factually sufficient to support the jury's damages findings regarding Durant's fraudulent inducement.

## IV. DEFAMATION

We now turn to the issues regarding Anderson's defamation claim. To do so, we find it necessary to recount in more detail the start of the defamation and its spread.

### A. DEFAMATION FACTS

### 1. Genesis of Statements

Maynard was supervised by Anderson at the Granbury Toyota dealership. As the sales manager, Maynard was aware that Anderson had bought used cars directly from Pro Financial. Indeed, Anderson testified that it "wasn't any secret" that he routinely bought cars directly from wholesalers, including Pro Financial. Maynard raised his concerns about the used cars to Anderson; Anderson told him that they "would work [their] way out of it."

In October 2011, Maynard told the finance manager for the Granbury Toyota dealership, Eddie Bermea, about his inventory concerns and that he suspected Anderson was taking kickbacks from Pro Financial. Maynard and Bermea decided to "do the best job [they] could to get rid of those cars and move forward."

On December 15 at Auto Group's Christmas party, Durant gave Anderson and others significant checks, which Anderson believed to be a bonus but which Reeves and Burdick believed to be a buy-out of their previously offered ownership interests as a result of Durant and Allen's recent agreement to sell Auto Group's dealerships. A short time later, Durant received a tip from another car dealer, Jerrel Bolton, that Durant should check his inventory.

On December 18, Durant and Allen asked Risinger to "appraise" the used-car inventory at the Granbury dealerships. Sean Opitz, Auto Group's controller, was also involved in the appraisal. Risinger and Opitz quickly discovered and reported that the inventory was worth less than what had been paid for it and that Anderson had bought the cars directly from Pro Financial, a wholesaler, which was against Auto Group's policy.

On December 23 or 24, Durant sent Cote, an experienced military investigator and a certified fraud examiner, to Granbury to "look at" and "investigate" the used cars at the Granbury dealerships. Durant told Cote at that time that he believed Anderson was taking kickbacks from Pro Financial. Cote did not ask Durant why he thought Anderson was taking kickbacks. Cote, in turn, told Opitz that Durant believed Anderson was taking kickbacks. A kickback accusation is "career-ending" in the car business and is equivalent to calling someone a thief.

Durant then met with Maynard on December 25 because Durant "was very anxious to find out what [Maynard] knew about the cars that Mr. Anderson had been

36

buying." Durant told Maynard that he suspected Anderson of taking kickbacks from Pro Financial[22] and that Maynard would be "in charge" of the Granbury Toyota dealership until Durant "got this inventory situation sorted out."

Cote admitted that his ensuing two-day investigation into the purchases from Pro Financial was "quick[]," "cursory," and "preliminary." Cote identified fifteen cars that Anderson had bought from Pro Financial in the summer of 2011, resulting in an apparent $30,856 loss to Auto Group. Cote also interviewed employees at the Granbury dealerships, including Maynard, "about the Pro Financial vehicles, their value, their condition, you know, the price they'd paid for them." Cote recounted that Maynard said the Pro Financial cars "were overpriced, some higher than retail." He could not remember if Maynard mentioned kickbacks. Maynard acknowledged that the discussion with Cote occurred, but he could not remember what his responses to Cote's questions were. Bermea "identified one specific car that . . . had been overpriced" but did not mention kickbacks. Risinger told Cote that Anderson was buying cars from a wholesaler. When Cote interviewed Anderson, Anderson brought copies of the drafts for the cars that he had bought directly from Pro Financial. Cote agreed that if Anderson was trying to hide any wrongdoing, he would have been doing "a terrible job" by producing those drafts. Even though the alleged kickback money was coming from outside of Auto Group, Cote did not interview anyone outside of

---

[22]Durant first testified that he had said this to Maynard but later testified that he had not.

37

the organization. At the end of his investigation, Cote discovered no evidence that Anderson received kickbacks from Pro Financial or its owner, Jake DeKoker.

Cote reported the results to Durant. Durant, however, then told Allen that he believed Anderson was taking kickbacks. Allen understood this to mean that Anderson was stealing from Auto Group, which did not surprise Allen after he looked "at more of the facts."

Durant and Cote met with Anderson and the other managers on December 28 and "publicly accused Anderson of mismanaging inventory and buying cars directly from wholesalers rather than at auction as company policy mandated." *Anderson*, 550 S.W.3d at 611. Cote told the assembled employees, "If you have an issue [at the Granbury Toyota dealership], come to [Maynard]."[23] In a later meeting that day between Anderson, Durant, and Cote, Durant had Cote read a polygraph-consent form to Anderson that included an allegation that Durant had received "wrongful compensation from Pro Financial." According to Anderson, Durant said, "You have taken kickbacks on these cars, and I have reliable sources."[24] Durant would not disclose those sources when Anderson asked. Durant later admitted that he had no

---

[23]Maynard was "let . . . go" from Auto Group in January 2013—one year after Anderson left.

[24]Durant testified that he did not "believe [he] used the word kickbacks" but he thought he had told Anderson that he was suspected of taking wrongful compensation.

38

evidence Anderson had taken kickbacks. After the polygraph was inconclusive, Anderson "hit the dirt" at Durant's invitation.

## 2. The Statements Spread

Like a bad game of telephone, the allegations against Anderson spread quickly. Rash, who worked for Pro Financial's competitor, told Bolton about his concerns with the Granbury Hyundai dealership's inventory (with the intent that Bolton in turn would tell Durant) after Rash saw several used cars at the Granbury Hyundai dealership with a Pro Financial sticker.[25] Rash approached Bolton because Bolton "kn[e]w how things work" and Rash wanted Bolton's opinion on whether Rash was "thinking right" about Anderson's wrongdoing. Bolton passed Rash's information to Durant. Rash additionally told Allen that Anderson was paying too much for used cars, which "didn't smell right." And Rash told Michelson, the owner of a car-auction business, that Anderson was "being relocated for taking duke"—"under-the-table money or a kickback." Rash did not tell Michelson from whom Anderson allegedly took kickbacks. Michelson then repeated the accusation against Anderson to DeKoker.

---

[25]Rash initially stated he told Bolton that Anderson was taking kickbacks but later changed his answer in an attempt to not use the word "kickbacks."

In January 2012, Mark Clark, a former sales manager at the Granbury Hyundai dealership,[26] contacted Cote about reinstating a car warranty for a car Clark had bought at the dealership. Cote told Clark that the car warranty would not be reinstated because "it was the fault of [Anderson]," that Anderson had failed a polygraph, that "money was always missing," and that Anderson "was taking kickbacks from wholesalers on purchased vehicles." Cote also stated that Anderson was "pointing the finger" at Clark for the missing money. Clark told Anderson about Cote's accusations; Anderson referred Clark to his attorney.

Gary Deere, a wholesaler, bought and sold used cars to Bruce Lowrie Chevrolet, which was owned by William Shapiro and managed by Chuck Terrill. Deere told Terrill about the "inventory being out of whack" at the Granbury dealerships and about the audit. Deere stated that he had "seen Andrew Anderson and Jake De[K]oker in a vehicle together[,] . . . exchanging money" on more than one occasion. Terrill understood this to mean that Deere had personal knowledge that Anderson was taking kickbacks. Shapiro was in the room when Deere told Terrill about what Deere reportedly had seen, but Terrill also stated that he called Shapiro to tell him that Anderson had been "let go . . . for . . . something to do with the inventory." At trial, Deere denied that he said he saw Anderson and DeKoker exchange money and denied that he said Anderson was fired for taking kickbacks.

---

[26] Anderson had fired Clark in November 2011 after Clark had refused to take a polygraph at Cote's request. Clark later sued the Granbury Hyundai dealership for wrongful termination.

But he admitted that he had heard from "several people" in 2012 that DeKoker was paying kickbacks to Anderson.

Amanda Hedrick, an employee of an auto-accessory company, heard a rumor that Anderson had left Auto Group after being accused of taking kickbacks. Hedrick told her supervisor, Carol Walsh, that Anderson was not working at the Granbury dealerships anymore because "rumor is he was taking kickbacks." She also told Shapiro's wife Brandi that Anderson "got fired for a kickback." Walsh stated that Hedrick told her Anderson was "selling used cars and getting kickbacks from Mr. De[K]oker." Walsh repeated the rumor to a local car dealer, Jeff England.

An employee of Auto Group's outside marketing firm, William Thompson, heard two Auto Group employees discussing why they thought Anderson was no longer at the Granbury dealerships and characterizing Anderson "as a thief."

Another wholesaler, Justin McLaughlin, had heard that there had been "an inventory problem" at the Granbury dealerships. McLaughlin discussed whether Anderson had been taking kickbacks with J.D. Minor and James Lopez, who were employed by "Roger Williams used cars." At the time, McLaughlin had no evidence that the rumor was true. Minor reported the conversation to Anderson.

Anderson raised a defamation claim against Durant, Cote, Deere, Rash, Michelson, and Maynard[27] (collectively, the defamation defendants) and specifically

---

[27]Anderson sued others involved in spreading the statement, but they are not parties to this appeal.

alleged that they had falsely accused Anderson of theft by taking illegal kickbacks. However, "Anderson admitted he talked about the accusations himself, telling a few personal friends. Anderson also discussed the kickback allegations with others in the local auto industry, including prospective employers, some of whom may have already known." *Anderson*, 550 S.W.3d at 612.

## B. JURY-CHARGE ARGUMENTS

As instructed by the Supreme Court and because the measuring stick by which we perform our sufficiency analyses is determined by the jury charge, we first address the defamation defendants' issues raising jury-charge error. *See Anderson*, 550 S.W.3d at 623 n.95; *Seger*, 503 S.W.3d at 407–08; *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002); *see also Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 629 (Tex. App.—Fort Worth 2011, pet. denied) (extending rule stated in *Seger* and *St. Joseph* regarding legal-sufficiency challenges to factual-sufficiency challenges). We review alleged jury-charge error for an abuse of discretion. *See Seger*, 503 S.W.3d at 407–08.

### 1. Question 12: "Did any of the [defamation defendants] publish a statement that Andrew Anderson was involved in taking kickbacks?"

First, the defamation defendants argue that this question was in error because it allowed the jury to "summarize or paraphrase" what each said regarding Anderson without agreeing on the content of each specific statement.

Anderson alleged in his petition that each of the defamation defendants told others that Anderson was taking illegal kickbacks. The testimony at trial showed that

42

each defamation defendant published either a statement that Anderson had been taking kickbacks—the "duke"—or a similar statement referable to a kickback scheme. Recovery for slander—spoken defamation—is not dependent on proving the exact language used by each declarant:

> In cases of libel [i.e., written defamation], the language used, being in writing, can and should be set forth in hæc verba, but the same rule cannot be made to apply to a case of slander where the slanderous words spoken are only lodged in the treacherous memories of witnesses. The [defamatory] imputation . . . is the basis of the action, and it cannot be made to depend upon allegation and proof of the exact language.

*Boeckle v. Masse*, 5 S.W.2d 195, 197 (Tex. App.—San Antonio 1928, no writ); *see Murray v. Harris*, 112 S.W.2d 1091, 1094 (Tex. App.—Amarillo 1938, writ dism'd); *accord Barber v. Nationwide Commc'ns, Inc.*, No. CIV. 3:95-CV-0656-H, 1995 WL 940517, at *3 (N.D. Tex. May 30, 1995) (mem. op. & order); *Razner v. Wellington Reg'l Med. Ctr.*, 837 So. 2d 437, 442 (Fla. Dist. Ct. App. 2002).

We conclude that the trial court did not abuse its discretion by submitting the collective statements' "substance and meaning," as pleaded by Anderson, which is all that is required in cases of slander. *Murray*, 112 S.W.2d at 1094; *see* Tex. R. Civ. P. 278. We reject the defamation defendants' arguments that the word-for-word oral statement each defendant made must have been specifically pleaded, replicated in the jury charge, and found by the jury in this case.[28] This is especially true when

---

[28]We disagree with the defamation defendants' assertion that we have held that a defamatory statement can never be objectively verified if there is no finding of a specific, verbatim statement. In the case they cite in support, we held in a TCPA

43

Anderson pleaded for recovery based on a generalized kickback statement and alleged that each defamation defendant had made a kickback statement. *See generally* Tex. R. Civ. P. 47(a) (requiring plaintiff to plead only "a short statement of the cause of action sufficient to give fair notice of the claim involved"); *Fawcett v. Rogers*, 492 S.W.3d 18, 26–27 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (op. on reh'g) (holding private plaintiff's pleading, by alleging facts consistent with defamation per se, "sufficiently put the Signing Defendants on notice that they could be defending against a defamation per se claim").

Second, the defamation defendants assert that this question is ambiguous because "there is no way to know whether the jury intended to find that each person actually published the specific statement in Question 12." But the charge asked the jury whether each defamation defendant published a kickback statement. The jury answered "Yes" for each specified defamation defendant.[29] The trial court did not abuse its discretion because the question allowed the jury to clearly indicate whether each specified defamation defendant had published a kickback statement.

appeal that the defendants' failures to include information that the plaintiff wished had been included in an allegedly defamatory pushcard were not "statements of fact; indeed, they [were] not statements at all." *Hotchkin v. Bucy*, No. 02-13-00173-CV, 2014 WL 7204496, at *4 (Tex. App.—Fort Worth Dec. 18, 2014, no pet.) (mem. op.). Anderson does not argue that the defamation defendants failed to include favorable information in their statements; thus, this case is factually inapplicable.

[29]Ten of the twelve jurors found that Durant had published a kickback statement; eleven of twelve, including the ten who had agreed on Durant, found that Cote had published a kickback statement. *See* Tex. R. Civ. P. 292(a). The jury was unanimous regarding the remaining defamation defendants.

44

## 2. Question 22 Instruction

In Question 22, the jury was asked to determine the amount of Anderson's damages proximately caused by "the statement determined by you to be defamatory."[30] As part of the question, the trial court instructed the jury "that the statement that Andrew Anderson was involved in taking kickbacks is defamatory 'per se'"; thus, "the defamation itself gives rise to a presumption of [the authorized] damages." The defamation defendants again argue that because the alleged defamatory statements were not specific, but were "derived by implication, inference, or innuendo," it was error to instruct the jury that the statements were defamatory per se. Because we have rejected the argument that each verbatim statement must be specified in the charge under the facts of this case, we find no abuse of discretion on this basis.

The defamation defendants also contend that whether the statement was defamatory per se should have been a question for the jury and should not have been submitted as a matter of law. A statement that "injure[s] a person in her office, profession, or occupation" is defamatory per se, allowing the jury to presume general damages. *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018), *cert. denied*, 139 S. Ct. 1216 (2019). And whether a statement qualifies as defamatory per se

---

[30]After the jury found in Question 12 that each defamation defendant published a kickback statement, it found in Question 13 that the statement as found in Question 12 was defamatory. Question 22 instructed that if the jury had found in Question 13 that the kickback statement from Question 12 was defamatory, then the statement was defamatory per se as a matter of law.

45

is a question of law for the court. *See McDonald Oilfield Operations, LLC v. 3B Inspection, LLC*, 582 S.W.3d 732, 749 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (op. on reh'g).

Many witnesses testified that an allegation that a car salesperson takes kickbacks is the most professionally damaging thing that can be said and equates to calling that salesperson a thief. The kickback statements affected Anderson in his business or profession and were defamatory per se as a matter of law and fact. *Cf. Tranum v. Broadway*, 283 S.W.3d 403, 419–20 (Tex. App.—Waco 2008, pets. denied) (plurality op. on reh'g) (finding evidence sufficient to support jury's finding of slander per se because statement injured plaintiff in his profession); *Bradbury v. Scott*, 788 S.W.2d 31, 38 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (concluding absence of jury finding regarding injury to reputation did not preclude plaintiff's libel recovery because publications charged plaintiff with "dishonesty in his dealings with his employer"). To the extent the defamation defendants assert that the non-specific nature of the found defamatory statement rendered defamation per se a fact question for the jury, we again reject that argument. The trial court did not abuse its discretion by instructing the jury that it could presume Anderson suffered general damages.

### 3. Instruction on Burden of Proof

Durant, Cote, and Maynard asserted that they could not be held liable for their kickback statements because of a qualified privilege. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). The jury found that Durant and Cote were

46

qualifiedly privileged to make the statements. However, proof that such statements were motivated by actual malice at the time of publication defeats the qualified privilege. *See id.*; *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 899 (Tex. 1970); *cf. N.Y. Times v. Sullivan*, 376 U.S. 254, 279–80 (1964) (defining and applying actual malice as an element of a public plaintiff's libel claim against a newspaper). The jury found that Durant and Cote made the statements with actual malice. Because the jury found that Maynard was not protected by a qualified privilege, the jury did not answer the actual-malice question as to him.

Durant and Cote now argue that the general introductory instruction in the charge, informing the jury that their answers were to be "based on a preponderance of the evidence" unless instructed otherwise, was in error regarding the jury's finding of actual malice to overcome their qualified privilege because actual malice must be based on clear and convincing evidence.[31] They argue that because the qualified privilege protects free speech, the clear-and-convincing standard applies to overcome the privilege.

A preponderance of the evidence is the burden of proof for all Texas civil cases unless the case involves "extraordinary circumstances, such as when we have been mandated to impose a more onerous burden." *Ellis Cty. State Bank v. Keever*, 888 S.W.2d 790, 792 (Tex. 1994) (op. on reh'g). In the defamation context, the

---

[31]Maynard joins in this argument, but the jury did not answer the actual-malice question as to him.

United States Supreme Court has mandated that a public-figure plaintiff must prove by clear and convincing evidence, as an element of his defamation claim, that the defendant published a defamatory statement with "actual malice." *Sullivan*, 376 U.S. at 279–80, 285–86; *see Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 116 (Tex. 2000). The constitutional concerns justifying this higher burden of proof are not present in defamation cases involving private speech between private individuals. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–60 (1985) (plurality op.); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341–44 (1974). We find no higher court mandate that a private defamation plaintiff must prove actual malice by clear and convincing evidence to overcome a private defendant's qualified privilege. *See Cent. Freight Lines, Inc. v. Kackley*, No. 14-96-00220-CV, 1997 WL 211612, at *3 (Tex. App.—Houston [14th Dist.] May 1, 1997, no pet.) (not designated for publication) ("[W]e hold that a private plaintiff in a defamation action is only required to prove actual malice [to overcome the qualified privilege] by a preponderance of the evidence, not by clear and convincing evidence."); Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business*, PJC 110.7 cmt. (2018) ("It is unclear whether the plaintiff's burden of proof to defeat the [qualified] privilege by showing actual malice is by a preponderance of the evidence or by clear and convincing evidence."); *cf. Gertz*, 418 U.S. at 344 (recognizing state interest in protecting private persons from defamation is greater than with public persons); *Keever*, 888 S.W.2d at 792–93 (declining to extend clear-and-convincing burden of

proof to malice element of malicious-prosecution claim). Accordingly, we conclude that the burden of proof to overcome the defense of qualified privilege applicable to private defamation is by a preponderance of the evidence. *See Seley-Radtke v. Hosmane*, 149 A.3d 573, 581–96 (Md. 2016);[32] David Elder, *Defamation: A Lawyer's Guide* § 2:31 (2019). *See generally* Barry A. Lindahl, *Modern Tort Law: Liability and Litigation* § 35:67 (2d ed. 2019) (recognizing jurisdictional split on correct burden of proof to apply to overcome qualified privilege).

As such, the trial court did not abuse its discretion by effectively instructing the jury to apply the preponderance burden to Anderson's assertion of actual malice to overcome Durant's and Cote's qualified privilege.[33] *See Seley-Radtke*, 149 A.3d at 593–96.

## C. SUFFICIENCY ARGUMENTS

A defamation claim involves four essential elements: (1) the publication of a false statement of fact to a third party without legal excuse, (2) that was defamatory concerning the plaintiff, (3) that was made with the requisite degree of fault, and

---

[32]We find the court's analysis of this issue in *Seley-Radtke* to be persuasive and adopt it as our own. It is not necessary to further discuss that court's exacting discussion in our already protracted opinion because our analysis would not vary in any material respect from *Seley-Radtke*.

[33]But as we indicate below, we would conclude that Anderson established Durant's and Cote's actual malice through legally and factually sufficient evidence even if a clear-and-convincing standard applied, rendering any charge error harmless. *See* Tex. R. App. P. 44.1.

(4) damages.  *See In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (orig. proceeding); *Randall's Food*, 891 S.W.2d at 646; *cf.* Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (providing prima facie libel elements).  The defamation defendants attack the legal and factual sufficiency of the evidence to support the first and fourth elements.

As with Durant's fraudulent-inducement sufficiency arguments, the majority of the defamation defendants' arguments focus on the lack of any evidence to support the element, attaching only an alternative, "and/or factually insufficient" tag at the end.[34]  As before, we will address both legal and factual sufficiency under the appropriate standards and scopes of review.  And we again stress that we must defer to the jury's credibility choices and resolutions of any conflicts in the testimony.  *See, e.g.*, *Anderson*, 550 S.W.3d at 617.

### 1. Publication

### a. Publication of a specific statement

The defamation defendants argue that Anderson did not provide sufficient evidence of the specific content of the published statements.  They assert that the evidence failed to show that any of them specifically stated that "Anderson was involved in taking kickbacks," which was the statement the jury was asked to find in

---

[34]Because the Supreme Court held that legally sufficient evidence supported Anderson's defamation damages for past mental anguish and for past injury to his reputation, *Anderson*, 550 S.W.3d at 618, 621, the defamation defendants' factual-sufficiency arguments directed to these two measures of damages are more thorough.  But they continue to assert that there is "legally and/or factually insufficient evidence" of proximate cause, which they argue would bar any damage recovery.

the jury charge. They also point to the fact that Anderson did not plead these specific words in his petition. In short, the defamation defendants urge us to conclude that Anderson had the burden to plead and prove each verbatim statement to hold any of them liable for slander.

Anderson alleged in his petition that each of the defamation defendants told others that Anderson was taking illegal kickbacks. Again, there was testimony at trial that each defamation defendant published either a statement that Anderson had been taking kickbacks—the "duke"—or a similar statement referable to a kickback scheme. We have already determined that a slander recovery is not dependent on proving the exact language used by each declarant. *See Murray*, 112 S.W.2d at 1094; *Boeckle*, 5 S.W.2d at 197; *cf. Turner*, 38 S.W.3d at 116 (holding falsity of defamatory statement must be "based on the meaning a reasonable person would attribute to a publication and not on a technical analysis of each individual statement"). We conclude that Anderson's pleadings and the proof at trial were legally and factually sufficient to show at least the defamatory words' "substance and meaning," which is all that is required in cases of slander. *Murray*, 112 S.W.2d at 1094; *see Patterson & Wallace v. Frazer*, 94 S.W. 324, 325 (Tex. 1906).

### b. Publication of a factual statement

### (1.) verifiable and factual

The defamation defendants, primarily relying on Anderson's testimony that Durant was "right to be suspicious" if Durant thought Anderson had lied, assert that

51

the kickback statements were mere statements of suspicion or of subjective opinion and, therefore, cannot be considered defamatory as a matter of law. Cote additionally relies on the language included in the polygraph consent form—"you may have received wrongful compensation from Pro Financial" and "you are suspected of receiving compensation"—to support his argument that the statements were mere suspicions. Deere, Rash, Michelson, and Maynard point to no specific evidence showing that their statements were ones of mere suspicion.

An opinion cannot support a claim for defamation. *See Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989). To be actionable, a statement must assert a verifiable fact. *See Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 794–95 (Tex. 2019); *Tatum*, 554 S.W.3d at 623–24. Whether the kickback statements were fact or opinion is determined based on their objective verifiability and in the context in which the statements were made. *See Scripps*, 573 S.W.3d at 794–95. This is a question of law. *See id.* at 795. We conclude that the statements, taken in context, were objectively verifiable.

First, Anderson testified that Durant's statements made to him in the presence of third parties were more than statements of suspicion or opinion but were statements of fact, which the jury was entitled to credit. Similarly, Allen understood Durant to be accusing Anderson of stealing, which did not surprise Allen based on his review of the "facts." Cote's statements to Clark that Anderson was a "thief" and was taking kickbacks were not couched as opinion or suspicion. Similarly, Cote told Opitz

52

that Anderson was taking kickbacks. With the intent that Bolton would tell Durant, Rash told Bolton that Anderson was taking kickbacks; Rash unequivocally declared to Michelson that Anderson was "taking duke" and "under-the-table money." Rash also repeated to others, including Risinger, that a DeKoker "runner" delivered "a bag of money" to Anderson even though Rash had no evidence that Anderson had taken kickbacks. Michelson told DeKoker that Anderson had been fired for taking kickbacks. Deere told Shapiro and Terrill that he had seen Anderson exchange money with DeKoker. Maynard told Durant that something "wrong" was going on with Anderson's used-car purchases and that when he "smells" something wrong, he is usually right.

Second, the fact an investigation was initiated shows that the statements were verifiable. The defamation defendants contend that because "it is unlikely Anderson or DeKoker would admit to a kickback scheme," the statements could not be verified. Although Durant testified that a kickback scheme would be "impossible to investigate" unless Anderson was seen "exchang[ing] cash," Cote's extensive experience with fraud investigations taught him that evidence of a kickback would be "difficult" to obtain, not impossible. In fact, when Cote interviewed Anderson during the investigation, Anderson was able to refute the accusation that the disputed used-car purchases resulted in a loss to Auto Group. And Durant's stated belief that a kickback scheme may only be proved through a confession was belied by his request for Cote and Risinger to investigate the kickbacks by auditing the used-car inventory

53

at the Granbury dealerships to determine if any were bought and sold for a loss,[35] by his sending Cote to Granbury to investigate, and by his asking Anderson to take a polygraph test.

Third, Durant made the statements as Anderson's supervisor, which contextually and reasonably indicated that his kickback statements were backed by facts. *See Bentley v. Bunton*, 94 S.W.3d 561, 581–84 (Tex. 2002) (*Bentley I*); *Backes v. Misko*, 486 S.W.3d 7, 25–27 (Tex. App.—Dallas 2015, pets. denied); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990) ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. . . . Simply couching such statements in terms of opinion does not dispel these implications."). Similarly, Cote was the lead investigator into Anderson's activities and he made his statements to Clark after that investigation. Maynard worked closely with Anderson at the Granbury Toyota dealership as the sales manager. Rash, Michelson, and Deere worked in the wholesale-buying business with Anderson. It would have been reasonable, based on this context, for each of these

---

[35]At trial, Durant denied that he asked anyone to investigate, stating that he only "asked [Cote] to see where all the cars come from that we had been buying down there." Durant argues in his brief on remand, however, that he "initiate[d]" an investigation into Anderson's used-car purchases.

54

defendants' statements to have been perceived as being based on facts and their personal knowledge of Anderson's buying tactics.[36] *See Milkovich*, 497 U.S. at 18–19.

Accordingly, we conclude that the evidence was legally and factually sufficient to show that the defamation defendants' kickback statements were not statements of subjective opinion or suspicion but were actionable statements of verifiable fact. *See id.* at 18, 20-22; *Scripps*, 573 S.W.3d at 795; *Bentley I*, 94 S.W.3d at 583–84; *Hoskins v. Fuchs*, 517 S.W.3d 834, 840–41 (Tex. App.—Fort Worth 2016, pet. denied); *Campbell v. Clark*, 471 S.W.3d 615, 627–28 (Tex. App.—Dallas 2015, no pet.); *cf. El Paso Times, Inc. v. Kerr*, 706 S.W.2d 797, 799 (Tex. App.—El Paso 1986, writ ref'd n.r.e.) (recognizing "a statement of opinion will not be protected if it is couched in such a way to imply that the author possesses undisclosed facts").

### (2.) identifiable source

The defamation defendants additionally attack the sufficiency of the evidence to show a specific factual statement because there was no clearly identified source of the kickback statements, rendering the statements not easily proved or disproved. Proof of the defendant's responsibility for the publication may be through direct or circumstantial evidence but must be sufficient to support a finding that the defamatory communication came from the defendant and not from some other

---

[36]For example, Allen testified that his kickback statements were based on his review of the facts.

source that does not implicate the defendant. 20 William V. Dorsaneo III et al., *Texas Litigation Guide* § 333.04[3][a] (2019).

We conclude that the evidence, at least circumstantially, sufficiently identified each defamation defendant as a specific source of the kickback statements and that each contributed to the statements' spread through the local car-dealership community. Durant acknowledged that he was a source of the kickback statements and that he published the statements to Cote, Maynard, and Allen. Allen understood Durant to be accusing Anderson of stealing, which did not surprise Allen. Cote repeated the statements to Clark and added that Anderson was "nothing but a thief" who had failed a polygraph exam. Maynard admitted that he discussed the kickback scheme with Bermea and Durant, telling Durant that Anderson's used-car purchases did not "smell" right; Maynard also told Cote during the investigation that the used cars Anderson had bought from Pro Financial had been overpriced. Rash told Bolton that Anderson's overpayment for the used cars was indicative of a kickback scheme, intending for Bolton to repeat Rash's information to Durant; Bolton did repeat the information to Durant. Rash also expressed a "smell" concern to Allen. Rash additionally told Michelson that Anderson had been taking kickbacks, and Michelson told DeKoker. Rash also told others that DeKoker had delivered a bag of money to Anderson. Deere told Terrill and Shapiro his story of seeing money exchange hands between Anderson and DeKoker, which Terrill understood to mean Anderson was taking kickbacks.

The defamation defendants' authority on this point is inapplicable. In their cited case, the Supreme Court held that a newspaper article based on five months of research and critical of a county's criminal-justice system could not have been easily disproved because there was no source that could do so. *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637–38 (Tex. 2005) (per curiam). This holding was in the context of discussing whether the newspaper engaged in actual malice, which is an element of a libel claim by a public-figure plaintiff against a media defendant. *Id.* at 636–37. The Supreme Court did not discuss whether a private plaintiff must show that a slanderous statement was made by someone who could readily prove or disprove his own statement. In this case, even if a private plaintiff must make such a showing, Anderson did so.[37]

### c. Publication *to* a third party

Durant and Cote argue that because they directed their December 28 kickback statements to Anderson and not to each other, they did not publish the kickback statement as matter of law. In making this argument, Durant and Cote point out that they were speaking to and looking at Anderson and not each other when they made these statements.

---

[37]We do not categorically hold that evidence of the specific source of a particular rumor is required in a private defamation case. We hold only that to the extent such evidence is required, Anderson sufficiently proved that each defamation defendant was a source of a kickback statement and contributed to the statements' spread.

The jury found that the defamation defendants published a statement that Anderson "was involved in taking kickbacks." The trial court defined publish as "to intentionally or negligently communicate the matter to a person other than Andrew Anderson who is capable of understanding its meaning."[38]

As the jury was charged, a statement of fact must be made to a person other than the plaintiff to be considered published. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017); *AccuBanc Mortg. Corp. v. Drummonds*, 938 S.W.2d 135, 147 (Tex. App.—Fort Worth 1996, writ denied); *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 335 (Tex. App.—Dallas 1986, no writ); *accord Scheel v. Harris*, No. 3:11-cv-00018, 2011 WL 2559880, at *4 (W.D. Va. June 28, 2011) (mem. op.). Publication is determined in light of the surrounding circumstances under which the statement was made. *See Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987).

We conclude that there was more than a scintilla of evidence, which was also factually sufficient, showing publication. When Durant made the statement to Anderson, Cote was present and participating in the meeting; when Cote read the form to Anderson, Durant was present and participating in the meeting. The fact that Durant and Cote did not literally address their comments to each other while making eye contact does not vitiate the fact that the comments were made in the presence of

[38]Durant and Cote do not clearly challenge the jury's finding that the relevant third party was capable of understanding the meaning of the statement, nor do they challenge the given definition of publish.

a third party other than Anderson.  *See* Restatement (Second) of Torts § 577 cmt. b (Am. Law Inst. 1977) ("It is not necessary that the defamatory matter be communicated to a large or even a substantial group of persons.  It is enough that it is communicated to a single individual other than the one defamed."); *cf. Smith v. Shred-It USA*, No. 3:10-CV-831-O-BK, 2010 WL 3733907, at *5 (N.D. Tex. Aug. 12, 2010) (Maj. J. recommendation) ("Texas law is clear that statements are 'published' even if only made to other employees or managers."), *adopted*, 2010 WL 3733902 (N.D. Tex. Sept. 23, 2010); *Mem'l Hermann Health Sys. v. Khalil*, No. 01-16-00512-CV, 2017 WL 3389645, at *6 (Tex. App.—Houston [1st Dist.] Aug. 8, 2017, pet. denied) (mem. op. on reh'g) ("Statements are considered published even if they are made to employees and managers in the same company."); *Wells v. Target Corp.*, No. 02-14-00359-CV, 2015 WL 1882540, at *2–3 (Tex. App.—Fort Worth Apr. 23, 2015, pet. denied) (mem. op.) (recognizing, in summary-judgment appeal, publication may be found if statement made to plaintiff in public place where others could overhear); *Stephens v. Delhi Gas Pipeline Corp.*, 924 S.W.2d 765, 769 (Tex. App.—Texarkana 1996, writ denied) ("Statements are published, even if they are made only to other employees or managers . . . ."); Dorsaneo, *supra*, at § 333.04[2] ("Statements made directly to the plaintiff, **and not overheard by third parties**, are not published." (emphasis added)).

Even if the statements from the December 28 meeting were not published as a matter of law, both Durant and Cote made the statement again to other third parties. Durant told Cote (before the December 28 meeting), Allen, and Maynard.  Those

59

third parties then repeated the statement to others. Cote told Clark that Anderson had been taking kickbacks, and Cote told Opitz that Anderson was taking kickbacks.

We conclude that there was more than a scintilla of evidence of publication by Durant and Cote and that the jury's finding of publication was supported by factually sufficient evidence.[39] *See, e.g.*, *Mem'l Hermann Health Sys. v. Gomez*, 584 S.W.3d 590, 611–12 (Tex. App.—Houston [1st Dist.] 2019, pet. filed); *Hous. Belt & Terminal Ry. Co. v. Wherry*, 548 S.W.2d 743, 751 (Tex. App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.).

## 2. Legal Excuse—Qualified Privilege

At trial, Durant, Cote, and Maynard contended that the kickback statements were protected by qualified privilege, vitiating the without-legal-cause component of the publication element.[40] *See Burbage v. Burbage*, 447 S.W.3d 249, 254 (Tex. 2014); *Randall's Food*, 891 S.W.2d at 646. If Durant, Cote, and Maynard proved the applicability of qualified privilege by a preponderance of the evidence, the kickback statements were not actionable. *See Iroh v. Igwe*, 461 S.W.3d 253, 263–64 (Tex. App.— Dallas 2015, pet. denied). But if Anderson proved that Durant, Cote, or Maynard

---

[39]Because the evidence was legally and factually sufficient to support the jury's finding of publication, we reject the defamation defendants' argument that the trial court abused its discretion by submitting the issue to the jury in the charge because they disproved publication as a matter of law.

[40]Some of the other defamation defendants apparently raised the defense of qualified privilege in the trial court, but only Durant, Cote, and Maynard now challenge the jury's findings on the privilege issue.

made the kickback statements with actual malice, qualified privilege is overcome and liability may attach to the kickback statements. *See Randall's Food*, 891 S.W.2d at 646; *Dun & Bradstreet*, 456 S.W.2d at 899.

### a. Maynard: qualified privilege

The jury found that Maynard's statements were not excused by the qualified privilege and were not made in the course and scope of his employment. As an apparent part of his qualified-privilege arguments, Maynard first attacks the jury's finding that he was not acting in the scope of his employment when he made the kickback statements, arguing that he conclusively established that fact and that the finding was against the great weight and preponderance of the evidence. Whether Maynard was acting in the scope of his employment is not relevant to Maynard's qualified privilege because whether he made the statements in the scope of his employment is not a required element of his qualified-privilege affirmative defense. *See Iroh*, 461 S.W.3d at 263–64; *Roberts v. Davis*, 160 S.W.3d 256, 263 (Tex. App.—Texarkana 2005, pets. denied); *cf. Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 578 (Tex. 2002) (recognizing employer may be held liable for employee's defamation if statement made in scope of employee's employment duties). Indeed, even though Anderson concedes that Maynard was acting in the scope of his employment when he made the kickback statements, the contrary finding is not relevant to whether Maynard was entitled to the qualified privilege. And Maynard does not explain how the employment-scope finding calls any challenged part of the judgment into

question. Thus, even if the employment-scope finding regarding Maynard was supported by insufficient evidence, it did not affect the trial court's resulting judgment as to Maynard. *Cf. Anderson*, 550 S.W.3d at 616 (holding because Anderson secured findings necessary to prevail on fraudulent inducement, his failure to appeal adverse breach-of-contract finding was "irrelevant").

Maynard next argues that he conclusively established his statements were protected by the qualified privilege and that the jury's failure to so find was against the great weight and preponderance of the credible evidence.[41] Maynard refers to the common-law, qualified privilege as two separate privileges—the investigative privilege and the common-interest privilege. There is one qualified privilege, which protects communications made in good faith between people with an interest sufficiently affected by the communication. *See Burbage*, 447 S.W.3d at 254; *Steinhaus v. Beachside Envtl., LLC*, 590 S.W.3d 672, 677 (Tex. App.—Houston [14th Dist.] 2019, pet. filed); *Richard Rosen, Inc. v. Mendivil*, 225 S.W.3d 181, 195 (Tex. App.—El Paso 2005, pet. denied). The privilege may be proven through several factual scenarios. *See* Dorsaneo, *supra*, at § 333.20[2]. One is by proving that a good-faith communication was made between people having a common business interest in employment-related

---

[41]We note that because Maynard bore the burden to establish the qualified privilege, which is an affirmative defense, he is correct that he must show either that he conclusively established the privilege or that the jury's failure to find the privilege was against the great weight and preponderance of the credible evidence. *See Burbage*, 447 S.W.3d at 254; *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241–42 (Tex. 2001) (per curiam).

62

matters or in reference to matters that the speaker has a duty to communicate to the other. *See Burbage*, 447 S.W.3d at 254; *Randall's Food*, 891 S.W.2d at 646; *Grant v. Stop-N-Go Mkt. of Tex., Inc.*, 994 S.W.2d 867, 874 (Tex. App.—Houston [1st Dist.] 1999, no pet.); Elder, *supra*, at § 2:24; Dorsaneo, *supra*, at § 333.20[2][a]. A second is by proving the communication was made during the course of an employer investigation following a report of employee wrongdoing. *See Randall's Food*, 891 S.W.2d at 646; *Richard Rosen*, 225 S.W.3d at 195; *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 497 (Tex. App.—Dallas 2003, no pet.); Dorsaneo, *supra*, at § 333.20[2][b]. The trial court submitted both of these scenarios to the jury. Although we disagree that these are two distinct privileges, both falling under the umbrella of qualified privilege, we use Maynard's shorthand references.

Maynard was the sales manager of the Granbury Toyota dealership and made the kickback statements to Bermea, the finance manager at the same dealership, in October 2011—two months before the investigation into Anderson's conduct. Both were supervised by Anderson. Maynard testified that he told Bermea because of the possible difficulty of obtaining financing for the cars if sold:

> Because the banks are going to lend money based off of what the book value is. If you can't get the car financed, you can't get it sold. If you own it for way too much money, the banks - - all they do is look at that book and look at the number. There's a loan value. There's a trade-in value. There's a retail value. They usually go off of . . . [t]rade-in value . . . to loan money. And if you own the car for a lot more than trade-in value and you own it for retail value, there's no place to make profit.

Maynard affirmed that these wholesale purchases made his job difficult. Maynard repeated the kickback statements to Durant during his Christmas meeting with Durant, and he told Cote about several cars that were overpriced during Cote's investigation. Anderson points to no evidence showing that Maynard made the kickback statements to anyone other than Bermea, Cote, and Durant.

### (1.) investigative privilege

Anderson argues that because Maynard made the kickback statements to Bermea before any investigation began in December 2011—not "in the course of an investigation following a report of employee wrongdoing"—Maynard may not rely on the investigative privilege. *Randall's Food*, 891 S.W.2d at 646.

As a preliminary matter, we address Anderson's assertion that the investigative privilege cannot apply as a matter of law because there was no investigation into whether Anderson took kickbacks, only into whether Anderson bought used cars from wholesalers against company policy. At trial and on appeal, the parties repeatedly attempted to draw this line regarding the subject matter of the investigation into Anderson's conduct. But in instructing Cote to investigate the used-car inventory, Durant specifically told Cote that he believed Anderson was taking kickbacks. And Cote admitted that any investigation into the policy violation would involve the reasons behind the policy—"to prevent irregularities in the purchasing of wholesale vehicles such as favoritism, overpricing, kickbacks and things like that." Although Cote had no "hard evidence" that Anderson was taking kickbacks, which

64

normally would have been "difficult" to obtain, the results of his investigation and Risinger's appraisal, including the policy violations, led Cote and Risinger to conclude kickbacks were involved. And the reason Durant and Cote asked Anderson to take the polygraph exam was to determine whether Anderson took kickbacks because that was the "one issue" that the investigation had not definitively resolved. We conclude that the evidence sufficiently established the investigation's purpose was to determine if the inventory issue and policy violations were tied to any wrongdoing by Anderson, which is all the specificity that the investigative privilege seems to require. *See, e.g.*, *id.*; *Austin*, 118 S.W.3d at 497.

Anderson next contends that Maynard's kickback statements to Bermea in October 2011 were not made during the course of the late December investigation into Anderson's wrongdoing; thus, the investigative privilege did not apply as a matter of law. We agree that the investigative privilege does not protect Maynard's statements to Bermea made at least two months before any investigation. *See Crouch v. J.C. Penney Corp., Inc.*, 564 F. Supp. 2d 642, 646–47 (E.D. Tex. 2008) (order), *aff'd*, 337 F. App'x 399 (5th Cir. 2009) (per curiam). But Maynard conclusively established that he made the kickback statements to Durant and Cote during the course of the investigation into Anderson's wrongdoing. *See generally Clark v. Jenkins*, 248 S.W.3d 418, 432 n.17 (Tex. App.—Amarillo 2008, pet. denied) (stating qualified privilege is an objective test, not reliant on defendant's perceptions of its applicability). As such, Maynard conclusively established that he was qualifiedly privileged to make the

65

statements to Durant and Cote as a matter of law, and the jury's contrary finding was not supported by legally sufficient evidence. *See Henriquez v. Cemex Mgmt., Inc.*, 177 S.W.3d 241, 253 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *cf. Burbage*, 447 S.W.3d at 254 ("Qualified privilege presents a question of law when the statements at issue employ unambiguous language and where the facts and circumstances of publication are undisputed.").

Because the jury's no-privilege answer regarding Maynard was not parsed as to which of Maynard's kickback statements were or were not privileged, our holding regarding Maynard's statements to Durant and Cote made under the investigative privilege does not end our qualified-privilege inquiry regarding Maynard's statement to Bermea.

### (2.) common-interest privilege

Maynard argues that he was qualifiedly privileged to make the kickback statements to Bermea because they had a common and corresponding business interest in "the book value of the cars" that "directly related to Bermea's ability to obtain financing for used car buyers and affected the profit made by the dealership on the sale of the car."[42] *See Burbage*, 447 S.W.3d at 254; *Randall's Food*, 891 S.W.2d at 646. The jury was charged that the common-interest privilege would apply if the kickback statement was "made in good faith on a subject matter in which the speaker

---

[42]Maynard does not argue that the common-interest privilege applies to his kickback statements to Durant and Cote.

66

has a common interest with the other person, or with reference to which the speaker has a duty to communicate to the other person." *See Bergman v. Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 816 (Tex. App.—Tyler 1980, no writ); *Butler v. C. Bank & Trust Co.*, 458 SW.2d 510, 514–15 (Tex. App.—Dallas 1970, writ dism'd).

Maynard and Bermea were highly placed managers at the Granbury Toyota dealership and their specific duties involved managing, financing, and tracking the used-car inventory at that dealership. Certainly, neither was a "disinterested third party" or "an 'ordinary' employee" as Anderson argues. Any good-faith statements they made to each other regarding a kickback scheme related to their common business interest in managing the sale and financing of the dealership's used-car sales. As Maynard argued to the jury, Maynard and Bermea had a common business interest: "That privilege [Anderson] talked about, it does apply. These people have an interest in this. They have a reason to be looking into this and they have a reason to talk about this." Maynard conclusively established that his statements to Bermea were protected by the common-interest privilege. *See, e.g.*, *Randall's Food*, 891 S.W.2d at 646–47 (holding managers who discussed possible theft by employee were qualifiedly privileged to do so as a matter of law because they "had an interest or duty in the matter"); *Martin v. Sw. Elec. Power Co.*, 860 S.W.2d 197, 199 (Tex. App.—Texarkana 1993, writ denied) (holding common-interest privilege applied because "[t]he summary judgment evidence here establishes conclusively that Turk and the addressees and recipients of his letter had specific duties to supervise SWEPCO's

67

employees in their work and safety practices"). Therefore, the jury's finding that Maynard was not qualifiedly privileged to make the kickback statements to Bermea was supported by legally insufficient evidence.

### b. Actual-malice defense to qualified privilege

### (1.) Maynard

Maynard's statements to Durant, Cote, and Bermea were qualifiedly privileged under the investigatory and common-interest theories as a matter of law unless Anderson proved that Maynard made them with actual malice. *See Randall's Food*, 891 S.W.2d at 646; *Dun & Bradstreet*, 456 S.W.2d at 899. "[A] statement is made with actual malice when the statement is made with knowledge of its falsity or with reckless disregard as to its truth." *Randall's Food*, 891 S.W.2d at 646; *see also Burbage*, 447 S.W.3d at 254.[43] Reckless disregard is shown if the speaker entertained serious doubts as to the truth of his kickback statements. *Elkins*, 553 S.W.3d at 611; *Campone v. Kline*, No. 03-16-00854-CV, 2018 WL 3652231, at \*10 (Tex. App.—Austin Aug. 2, 2018, no pet.) (mem. op.). The trial court tracked these precepts in the jury charge

---

[43]We note that many of the cases cited by the parties regarding actual malice in the defamation context address actual malice as an element of a public plaintiff's defamation claim. *See, e.g.*, *Carr*, 776 S.W.2d at 570–71; *Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 610 (Tex. App.—San Antonio 2018, no pet.); *cf. Hagler v. Proctor & Gamble Mfg. Co.*, 884 S.W.2d 771, 771 (Tex. 1994) (per curiam) (recognizing actual malice in context of qualified privilege is "separate and distinct from traditional common law malice"). To the extent possible, we have attempted to cite authorities discussing actual malice in the context of qualified privilege. By doing so, however, we are not holding for purposes of this appeal that the standards are substantively different; none of the parties argues that they are.

and conditionally submitted the actual-malice question on an affirmative finding that Maynard was protected by qualified privilege.[44] The defamation defendants requested the conditional submission. Anderson did not propose an actual-malice question, conditional or otherwise, regarding Maynard's qualified privilege. The defamation defendants later objected to the inclusion of the question "because there [was] no evidence" that any had spoken with actual malice. Anderson objected to the qualified privilege being submitted at all because he asserted that the applicability of the privilege was a question of law for the trial court. No party objected to the conditional nature of the actual-malice question before it was submitted to the jury. Because the jury found that Maynard was not entitled to the qualified privilege, it answered "no vote" to the actual-malice question regarding Maynard.

Maynard asserts that Anderson failed to show by legally or factually sufficient evidence the actual malice required to overcome the qualified privilege regarding his statements to Durant, Cote, and Bermea. Maynard argues that because Anderson did not obtain a malice finding, a take-nothing judgment should be rendered based on Maynard's qualified privilege. Anderson counters that because qualified privilege is a question of law, the absence of an actual-malice finding by the jury is not fatal based on the conclusive proof of Maynard's actual malice. *See* Tex. R. Civ. P. 279 ("[A]ll independent grounds of recovery or of defense not conclusively established under the

---

[44]"If you answered 'Yes' to any part of [the qualified-privilege questions], then as to those and only those defendants to which you answered 'Yes' . . ., answer the following [actual-malice] question."

evidence and no element of which is submitted or requested is waived."). Anderson does not raise an appellate jury-charge complaint directed to the conditional submission of his actual-malice defense to Maynard's qualified privilege.

Although the applicability of qualified privilege in the defamation context is a question of law, *see Burbage*, 447 S.W.3d at 254, whether the privileged statement was made with actual malice is a question of fact, *see Wal-Mart Stores, Inc. v. Odom*, 929 S.W.2d 513, 525 (Tex. App.—San Antonio 1996, writ denied) (op. on reh'g). Because Anderson failed to secure a jury finding on his actual-malice defense, he was required to have conclusively established Maynard's actual malice in order to overcome Maynard's qualified privilege and extend liability to Maynard's kickback statements, which are presumed to have been made without malice. *See Gulf States Util. Co. v. Low*, 79 S.W.3d 561, 565 (Tex. 2002) ("[A] party waives an entire theory of recovery or defense when not objecting to its omission from the charge."); *Little Rock Furniture Mfg. Co. v. Dunn*, 222 S.W.2d 985, 990 (Tex. 1949) ("[W]here the charge of the court instructs the jury to answer a special issue only conditionally, and the jury in compliance with the instruction fails to answer the issue, a party who did not object to the conditional submission waives the right to have the issue answered and also necessarily waives the right to any benefits which he might receive from a favorable answer to such issue."); *Batra v. Covenant Health Sys.*, 562 S.W.3d 696, 710 (Tex. App.—Amarillo 2018, pet. denied) (recognizing good faith and lack of malice are presumed if qualified privilege applies); Roy W. McDonald & Elaine A. Grafton

70

Carlson, *McDonald & Carlson Texas Civil Practice* § 22:53 (2d ed.) ("[T]he improper conditioning of a jury question, without objection, equates to an omission of the matter from the charge. . . . [O]mitted independent grounds of recovery or defense . . . are waived . . . ."). *See generally Burbage*, 447 S.W.3d at 254 ("If a defendant establishes the [qualified] privilege, the burden shifts to the plaintiff to prove that the defendant made the statements with actual malice.").

The evidence does not reflect as a matter of law Maynard's subjective knowledge of the falsity of or reckless disregard for the truth of his privileged kickback statements to Bermea, Durant, and Cote. *Cf. Austin*, 118 S.W.3d at 497 ("[T]he issue as to actual malice is the speakers' subjective state of mind."). Maynard discussed the used-car inventory with Bermea; but because neither wanted to start rumors about their supervisor, both decided to go no further with their suspicions. Although Anderson asserts that Maynard's reticence to start a rumor shows that he knew his statements were false or that he acted with reckless disregard to their truth, justifying an actual-malice finding as a matter of law, Maynard's failure to further investigate his statements does not equate to evidence of his significant doubts about their truth, of his knowledge that the statements were in fact false, or of his purposeful avoidance of the truth. *See Urban Eng'g v. Salinas Constr. Techs., Ltd.*, No. 13-16-00451-CV, 2017 WL 2289029, at *7 (Tex. App.—Corpus Christi–Edinburg May 25, 2017, pet. denied) (mem. op.); *Austin*, 118 S.W.3d at 497–98. As Maynard points out, there is no record evidence that Bermea repeated the subject matter of his

71

conversation with Maynard to anyone. And Maynard raised his suspicions to Durant and Cote when both asked Maynard during the investigation into Anderson's conduct. Maynard did not spread the rumor outside of his established qualified privilege. *See Steinhaus*, 2019 WL 6317686, at \*4.

Anderson failed to prove Maynard's actual malice as a matter of law; thus, we may not assign error to the jury's failure to find, based on an unobjected-to conditional submission, that Maynard acted with actual malice. Because Maynard established the qualified privilege as a matter of law and because Anderson failed to conclusively establish Maynard's actual malice, Maynard cannot be held liable for Anderson's defamation damages; thus, we must render a take-nothing judgment as to Maynard. *See, e.g.*, *Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 177 (Tex. 1986) (per curiam) ("There was no evidence to support the jury's answer to market value. Rendition is proper.").

## (2.) Durant and Cote

The jury unanimously found that although Durant's and Cote's kickback statements were excused by the qualified privilege, they acted with actual malice. Durant and Cote contend that there was no evidence they acted with actual malice and, alternatively, that the jury's actual-malice finding was against the great weight and preponderance of the contrary credible evidence. Because the jury found Durant and Cote were qualifiedly privileged to make the kickback statements, good faith and the lack of malice are presumed. *See Batra*, 562 S.W.3d at 710. As we discussed earlier,

72

Anderson had to overcome the no-malice presumption by a preponderance of the evidence.[45]

Again, a qualified privilege is voided if the statement was subjectively made with knowledge of its falsity or with reckless disregard for its truth—with actual malice. *Randall's Food*, 891 S.W.2d at 646; *see also Burbage*, 447 S.W.3d at 254; *Bentley I*, 94 S.W.3d at 591; *Campone*, 2018 WL 3652231, at *10; *Austin*, 118 S.W.3d at 497. But a speaker's subjective state of mind may be proven through circumstantial evidence. *See Bentley I*, 94 S.W.3d at 591. A defendant's ill will toward the plaintiff does not equate to actual malice, but it can be a circumstantial fact partially supporting an actual-malice finding. *Id.* at 602. A purposeful avoidance of the truth and lack of care also circumstantially and partially support such a finding. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 684–85, 692 (1989); *Bentley I*, 94 S.W.3d at 591, 596.

### (a.) Durant

Durant admitted that he was the source of the kickback statement,[46] which he told others and which he began to investigate ten months after Anderson, a ten-year employee and a member of the board of directors, accepted his offer of an ownership interest in the Granbury dealerships. He told Anderson that he had reliable sources to

---

[45]Our analysis would not be affected even if a clear-and-convincing burden were applied.

[46]The jury unanimously found that the kickback statements were not substantially true, and none of the defamation defendants clearly challenge this finding.

73

back up his allegations but refused to tell Anderson who the sources were. Durant admitted that he had doubts about the truth of his kickback statement—"[I]t never occurred to me [Anderson] was going to fail the [polygraph] test." And he never contacted DeKoker about the allegations because Durant subjectively believed that DeKoker would not have confessed and that it would be impossible to prove any kickbacks absent seeing "somebody exchange cash." Cote however testified that it would be "difficult" to procure evidence of a kickback scheme, not that it was impossible. Durant testified that he never had evidence that Anderson was taking kickbacks. Durant did know, however, that the kickback statement would severely harm Anderson's reputation.

Durant points to competing evidence in the record, mainly his own trial testimony, and asserts that he had some basis to believe Anderson was taking kickbacks. But the jury was entitled to believe the evidence recited above showing that Durant published the kickback statement with reckless disregard for its truth and was entitled to disbelieve Durant's self-serving attestations that his publication was not motivated by actual malice. *See Bentley I*, 94 S.W.3d at 596, 599–600; *Campbell*, 471 S.W.3d at 630–31; *Ramos*, 711 S.W.2d at 336; *Frank B. Hall & Co. v. Buck*, 678 S.W.2d 612, 621 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *cf. Anderson*, 550 S.W.3d at 617 (holding when evaluating jury's verdict, courts should reasonably harmonize findings and recognizing jury may credit some parts of witness's testimony and reject other parts of same witness's testimony in reaching

those findings). The jury could have discredited the evidence that the bases for Durant's belief were reasonable in light of the competing circumstantial evidence that those bases were unreasonable. *See Bentley I*, 94 S.W.3d at 596; *cf. Cox Tex. Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 444 (Tex. App.—Austin 2007, pet. denied) (holding defendant's "reasonable belief" negated reckless disregard). The record reflects that the evidence Durant acted with actual malice to overcome the found privilege was more than a scintilla and that it was in satisfactory harmony with the jury's malice finding.[47] *See Bentley I*, 94 S.W.3d at 600–02; *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 576–79 (Tex. App.—Austin 2007, pets. denied) (op. on reh'g). *See generally* 50 Tex. Jur. 3d *Libel* § 135 (2015) ("It is for the jury in a libel suit to resolve any dispute in the evidence as to the circumstances under which a publication was made.").

### (b.) Cote

Cote testified that when he accused Anderson of taking kickbacks, which was after his investigation, he had no evidence that Anderson had taken any kind of wrongful compensation from DeKoker or Pro Financial. Cote never interviewed anyone outside of Auto Group even though any kickbacks would have come from outside Auto Group. Cote took no notes of his interviews even though he always had in the past, and he described his investigation as "preliminary," "cursory," and "done

---

[47]Our holding would be the same under a clear-and-convincing burden of proof as opposed to the preponderance-of-the-evidence standard we previously found applicable.

quickly." But when Cote interviewed Anderson, Anderson brought paperwork on the questionable purchases, which Cote admitted would have been a poor way to hide a kickback scheme. Cote nonetheless repeated the kickback statement to Clark and Opitz, going so far as to tell Clark that Anderson had failed his polygraph, which was not true, and that "money was always missing" from the Granbury dealerships. And again, the fact that there was some evidence that Cote published the kickback statements without malice does not mean that the jury could not credit the competing evidence that Cote published the statements with reckless disregard for their truth. We conclude that the evidence was legally and factually sufficient to support the jury's finding that Cote acted with actual malice sufficient to overcome the qualified privilege.[48]

### 3. Damages

The Supreme Court held that the evidence was legally sufficient to support the jury's damages findings regarding Anderson's past mental anguish and regarding the past damage to Anderson's reputation—general damages. *Anderson*, 550 S.W.3d at 618, 621. The Court agreed that there was no evidence to support any damages for future mental anguish or for future reputation damages—general damages. *Id.* at 618, 623. And the Court held that there was less than a scintilla of evidence that the defamation proximately caused the damages the jury awarded for past and future lost

---

[48]Again, our holding would be the same under a clear-and-convincing standard.

76

income—special damages. *Id.* at 623–24. Accordingly, we address only those general damages that were supported by legally sufficient evidence.

### a. Proximate cause

Durant, Cote, Deere, Rash, and Michelson[49] argue that the evidence is "legally and/or factually insufficient" to support the jury's finding that the kickback statements were the proximate cause of Anderson's general damages. As we previously discussed in the context of the jury charge, the kickback statements were defamatory per se. "Texas law presumes that defamatory per se statements cause reputational harm . . . ." *Burbage*, 447 SW.3d at 259; *see Lipsky*, 460 S.W.3d at 596. Thus, the fact of at least nominal damages, including causation, is presumed;[50] but, Anderson was required to proffer sufficient evidence of the amount of those damages. *See Tex. Disposal Sys.*, 219 S.W.3d at 584; *see also Gertz*, 418 U.S. at 350 (recognizing that defamation damages for actual injuries "must be supported by

---

[49]Maynard joins in this argument; but because of our qualified-privilege holding, we do not address his damages arguments.

[50]Even if causation were not presumed, we agree with Anderson that the sufficiency of the causation evidence for Anderson's defamation damages would be measured by the charge—whether the defamation defendants could have foreseen that the kickback statements would be repeated. As Anderson asserted in his briefing and at oral argument, the evidence sufficiently showed this fact, at least circumstantially: Durant could reasonably foresee that "[t]he statement that [he] made to three men in his organization on four different occasions without ever making any effort to ensure that that information and those conversations would be confidential. There's no serious dispute here that [Durant] could reasonably foresee that his statements . . . could get . . . outside [of his organization]. He himself said word travels fast in the car industry and he acknowledged that it would harm Mr. Anderson if it did."

competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury").

### b. Past damage to Anderson's reputation

Durant, Cote, Deere, Rash, and Michelson argue that the evidence is factually insufficient to support the jury's finding that Anderson sustained damages attributable to past damage to his reputation. These damages are not susceptible to precise calculation but should be more than theoretical. *Anderson*, 550 S.W.3d at 621. A calculation touchstone is "reasonable compensation" and is estimated at the jury's discretion. *Id.*; *see Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 159–60 (Tex. 2014); *Frank B. Hall*, 678 S.W.2d at 630; Restatement (Second) of Torts § 912 cmt. b (Am. Law Inst. 1979). A lost job opportunity may be evidence of loss of reputation but only if it is connected to the defamatory statements. *Anderson*, 550 S.W.3d at 621. But rumors are not enough; the evidence must show that people believed the rumors, adversely affecting Anderson's reputation. *Id.*; *Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017) (5–4 opinion). In any event, "[a]wards must both be fair and compensate the plaintiff for the injury, and must not amount to 'disguised disapproval of the defendant.'" *Waste Mgmt.*, 434 S.W.3d at 161 (quoting *Bentley I*, 94 S.W.3d at 605). We are authorized to assay the amount of such awards for factually sufficient evidence. *See Anderson*, 550 S.W.3d at 620; *Bentley I*, 94 S.W.3d at 605–06. *See generally Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986) (per curiam)

78

("Lower courts should examine all the evidence in the record to determine whether [factually] sufficient evidence supports the damage award . . . .").

### (1.) more than nominal damages

The Supreme Court found that the evidence of Anderson's lost reputation in the past was legally sufficient and created a reasonable inference that Anderson's reputation changed for the worse as a result of the kickback statements. *Anderson*, 550 S.W.3d at 623. The court focused on Hiley's testimony that he had heard the kickback rumors, causing him to not take his interest in hiring Anderson "any further," and that he would consider Anderson for a future job only after the "outcome" of the kickback rumors was determined.[51] *Id.* at 622–23. Durant, Cote, Deere, Rash, and Michelson point to the fact that Anderson eventually was able to find a job with another car dealership and to witnesses outside Auto Group who testified Anderson had a good reputation.

Anderson's resumption of work did not negate that his reputation was damaged by the kickback statements, *see id.* at 622; the damage is presumed because the statements were defamatory per se, and the jury was entitled to credit and weigh Hiley's testimony as compared to the other witnesses'. We conclude that the evidence was factually sufficient to support an award for reputational damage over and above

---

[51]Durant, Cote, Deere, Rash, and Michelson again try to put a different spin on Hiley's testimony, but we are mindful of the Supreme Court's view of Hiley's testimony: "Hiley's opinion of Anderson changed to the point that he would not consider Anderson for any position unless his name were cleared." *Anderson*, 550 S.W.3d at 623.

nominal damages. *See Brady*, 515 S.W.3d at 887–88; *see also Cullum v. White*, 399 S.W.3d 173, 184 (Tex. App.—San Antonio 2011, pet. denied) ("In [*Bentley I*], the Texas Supreme Court considered, among other issues, whether the evidence supported any award of actual damages to the plaintiff, and alternatively, whether the amount of actual damages was supported by the evidence."); *cf. Waste Mgmt.*, 434 S.W.3d at 161 ("Without any supporting evidence of actual damages for injury to its reputation, TDS is entitled only to nominal damages in accordance with our decisions on presumed damages in defamation per se cases."). *See generally Anderson*, 550 S.W.3d at 623 ("The court of appeals did not reach the factual-sufficiency challenges [the defamation defendants] raised [regarding reputation damages], but may do so on remand.").

We disagree with Durant's argument that finding him liable for Anderson's reputational-injury damage impermissibly imposes on him a vicarious liability for statements made by others.[52] The trial court instructed the jury, with no objection, that the found defamatory statements could be considered the proximate cause of any reputational injury in the past if they could "have foreseen that [Anderson's injury] . . . might reasonably result" from the defamatory statements. The evidence we have discussed allowed the jury to find that Durant could have foreseen that the kickback statements he published would be repeated to others inside and outside Auto Group,

---

[52]Cote, Deere, Rash, and Michelson do not adopt this argument in their brief nor do they independently raise it.

causing damage to Anderson.  *See Stephan v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 889–90 (Tex. App.—Dallas 2000, no pet.).

### (2.)  $400,000

As to the factual sufficiency of the evidence to support the awarded amount, the Supreme Court expressly stated that $400,000 appeared to be excessive because it "is substantially higher than amounts awarded in equally or more egregious cases" and pointed out that we may suggest a remittitur or remand for a new trial.  *Anderson*, 550 S.W.3d at 621, 623; *see Morrill v. Cisek*, 226 S.W.3d 545, 550 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("The amount of damages in a defamation case is peculiarly within the province of the fact-finder, and an appellate court will not disturb the verdict or award unless it appears from the record to be excessive . . . ."). As comparators, the Supreme Court pointed to a $30,000 award and a $50,000 award, which had been upheld.  *Anderson*, 550 S.W.3d at 623 n.93.  To determine excessiveness, we may look to the seriousness of the defamatory statements, the extent of the dissemination, the extent to which people believed the defamation, and Anderson's professional reputation and prominence in the community.  *See Grossman v. Goemans*, 631 F. Supp. 972, 974 (D.D.C. 1986); *Bongiovi v. Sullivan*, 138 P.3d 433, 577–78 (Nev. 2006); 8A Stuart M. Speiser et al., *American Law of Torts* § 29:132 (Mar. 2020).  As did the Supreme Court, we refer to awards in similar cases that have been upheld, relying on the particular facts of the case at hand to determine if the evidence was factually sufficient to support a $400,000 award for past reputational damage or if

it is excessive. *See Anderson*, 550 S.W.3d at 620–21, 623; *cf. HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 872 (Tex. App.—Fort Worth 2005, no pet.) ("Even though each case must be judged on its own unique facts, it is proper to consider other approved awards in similar cases to determine if an award for pain and suffering is excessive.").

### (a.) excessiveness factors

The evidence was undisputed that the kickback statements were serious and were among the most damaging accusations that could be said about a car salesperson. Durant acknowledged that his own reputation was priceless and that the proposed purchase price for Auto Group—$44 million—was based on Durant's name and goodwill in the industry. Before the kickback statements, Anderson had a good reputation and had been the public face and voice for the Weatherford and Granbury dealerships in the dealerships' commercials. After the kickback statements, Anderson had difficulty finding a job and eventually had to accept a position with less responsibility and for less than half of the $300,000 base salary he had received at Auto Group. But even though the kickback statements traveled quickly outside of Auto Group and into the dealership community at large, Anderson discussed the statements himself with others outside of Auto Group, as noted by the Supreme

Court. *Id.* at 612. And Anderson points to no evidence, other than Hiley's testimony, that the kickback statements were believed.[53]

## (b.) comparator cases

Reputational-damage awards that have been upheld in other cases have been less than $400,000. The evidentiary support for the amount of the upheld $30,000 award in *Brady*, which the Supreme Court pointed to here, was not analyzed in that case; the issue was whether legally sufficient evidence supported any amount for reputational damages where such damages were not presumed. 515 S.W.3d at 886–88. Because there was evidence that the plaintiff lost his job based on an article characterizing him as "unruly and intoxicated," the Supreme Court concluded that legally sufficient evidence supported damages for loss of reputation. *Id.* at 881, 887–88.

Regarding the upheld $50,000 award in *Cullum*, cited by the Supreme Court here, the San Antonio Court of Appeals addressed the legal sufficiency of the evidence to support the amount of the award where a ranch owner sued a former employee after the employee posted on a website that the ranch was involved in various crimes. 399 S.W.3d at 182–84. That court found that legally sufficient evidence supported the damage-to-reputation award based on evidence that a television show would no longer film at the ranch because of the former employee's

---

[53]For example, Hedrick testified that the kickback rumors, which she repeated to others, did not adversely affect her opinion of Anderson.

defamatory statements and that the ranch owner's reputation had been very important to her. *Id.* at 185–86.

In *Bentley I*, the Supreme Court found sufficient evidence to support an award of $150,000 for reputational damages. 94 S.W.3d at 605, 607. There, the host of a local call-in radio and television show "repeatedly" stated for several months that a judge acted illegally in a particular case and made the "system look corrupt." *Id.* at 566–69. The judge testified that he was embarrassed in the community based on the defamatory statements, and his friends testified that "his honor and integrity had been impugned." *Id.* at 606. The Supreme Court concluded that the award for "damages to his character and reputation" as "found by the jury are well within a range that the evidence supports." *Id.* at 605, 607; *see also Aldous v. Bruss*, 405 S.W.3d 847, 862–63 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (concluding $150,000 reputational damage not excessive because defendant admitted making repeated and public per se defamatory statements, some of which he published by email and on the internet, and because plaintiff testified his reputation was affected). But the Supreme Court in *Waste Management* held that no evidence supported a $5 million award for loss of reputation where the only evidence was the plaintiff's testimony that his reputation was priceless. 434 S.W.3d at 160.

A $250,000 award for past reputational damage was upheld in a case involving a Muslim business owner who, for two years, was the target of the defendant's multiple defamatory statements that the business owner supported pornography and

84

"work[ed] against all Islamic values." *Memon v. Shaikh*, 401 S.W.3d 407, 410–11 (Tex. App.—Houston [14th Dist.] 2013, no pet.), *and judgment withdrawn after settlement*, No. 14-12-00015-CV, 2014 WL 6679562, at *1 (Tex. App.—Houston [14th Dist.] Nov. 25, 2014, no pet.) (per curiam) (mem. op.). The defendant's campaign against the business owner included emailing hundreds of area Muslims and repeatedly and publicly urging that the business owner be forced out of his positions with Houston Pakistani or Islamic organizations. *Id.* at 420–21. This evidence sufficiently supported the $250,000 award. *Id.* at 420–23. In its opinion, the Fourteenth Court of Appeals considered several other cases where reputational-injury awards ranging from $15,000 to $100,000 were upheld. *Id.* at 422. The court recognized that these cases showed a $250,000 award was supportable by the evidence based on "the sheer number of defamatory statements and the wide audience to which Memon published them over a period of more than two years." *Id.*

The court in *Memon* partially relied on *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g). In *Pitts*, three lawyers—Pitts, Collard, and Schechter—were part of a large settlement for a breast-implant class action. *Id.* at 309. A dispute arose about the proper division of the resulting attorneys' fees, which was resolved in Schechter's favor. *Id.* at 310. Schechter later was appointed to the board of Harris County's transit authority. *Id.* Soon thereafter, Pitts spoke at a televised Houston City Council meeting and "insinuate[d] that Schechter was difficult, dishonest, and unethical in the conduct of

his business and political affairs." *Id.* Pitts was not a resident of Houston at the time. *Id.* at 331. Schechter sued Pitts's law firm for defamation, and a jury awarded Schechter $100,000 for damage to his reputation. *Id.* at 311, 328. The court of appeals concluded that this amount was supported by the evidence. *Id.* at 330.

### (c.) determination

Based on the evidence regarding Anderson's reputational damages, the cases discussed above, and the Supreme Court's suggestion that the jury's award appeared excessive, we conclude that the $400,000 award for past reputational damages, which goes beyond reasonable compensation, is excessive and, thus, is supported by factually insufficient evidence. *Anderson*, 550 S.W.3d at 620, 623; *Pitts & Collard*, 369 S.W.3d at 330; *see, e.g.*, *Waste Mgmt.*, 434 S.W.3d at 160–62 (finding insufficient evidence to support $5 million award for corporation's past injury to reputation and awarding "nominal damages"); *Memon*, 401 S.W.3d at 420–23 (concluding evidence of past injury to reputation sufficient to support $250,000 award in case where defendant "selected his audience . . . over a period of more than two years" and made "hundreds" of targeted defamatory statements); *Med. Gardens, LLC v. Wikle*, No. 07-12-00111-CV, 2013 WL 2390103, at *3 (Tex. App.—Amarillo May 29, 2013, no pet.) (mem. op.) (finding sufficient evidence to support $45,000 as damages for past reputational injury); *cf. Morrill*, 226 S.W.3d at 550–51 (finding legally sufficient evidence to support $25,000 award for damage to plaintiff's reputation). *See generally Champion Printing & Copying LLC v. Nichols*, 03-15-00704-CV, 2017 WL 3585213, at *6

(Tex. App.—Austin Aug. 18, 2017, pet. denied) (mem. op.) ("Our review is one of factual sufficiency, examining the entire record to determine whether damage awards are supported by insufficient evidence—that is, whether they are excessive or unreasonable.").

But what remedy is appropriate? The Supreme Court suggested a remittitur or a new trial. *Anderson*, 550 S.W.3d at 621, 623. The defamation defendants urge either a new trial or a reduction by remittitur to an award in the range of $5,000 to $15,000. Anderson argues that if the evidence is factually insufficient to support a $400,000 award, the evidence does support $300,000, resulting in a suggested remittitur of $100,000.

The wide range of these suggested numbers is the best explanation of why we are reticent to suggest a remittitur. *See generally Brady*, 515 S.W.3d at 887 ("But when the damages are for non-economic losses, such as mental anguish or lost reputation, the jury must be given some latitude because these general damages are, by their nature, incapable of precise mathematical measure. . . . Even so, evidence of loss of reputation should be more than theoretical."). But we have concluded that no other portion of the trial court's liability judgment must be reversed and remanded for a new trial; thus, we may not remand for a new trial solely on unliquidated damages in a case where liability was contested. *See* Tex. R. App. P. 44.1(b); *Rancho La Valencia, Inc. v. Aquaplex, Inc.*, 383 S.W.3d 150, 151–52 (Tex. 2010) (per curiam). We therefore determine, based on the particular facts of this case and the comparator cases

discussed above, that an award of $150,000 for Anderson's past reputational damages would be supported by factually sufficient evidence. *See, e.g.*, *Bentley I*, 94 S.W.3d at 605–07; *Aldous*, 405 S.W.3d at 862–63; *cf. Champion Printing*, 2017 WL 3585213, at *6–7 (finding $15,000 award for past injury to reputation not excessive); *Memon*, 401 S.W.3d at 420–22 (upholding $250,000 award for two-year targeted defamatory campaign against plaintiff); *Pitts*, 369 S.W.3d at 310, 330 (finding evidence factually sufficient to support $100,000 award for damage to reputation).

We suggest a remittitur of $250,000, causing Anderson's reputational damage award to be $150,000. *See* Tex. R. App. P. 46.3. If Anderson files this remittitur with the trial court clerk within fifteen days of our judgment and notifies the court of such, we will reform this portion of the trial court's judgment and, as reformed, affirm the past reputational damages award. Otherwise, we will reverse the trial court's defamation judgment and remand for a new trial on Anderson's defamation claim against Durant, Cote, Deere, Rash, and Michelson. *See Rancho La Valencia*, 383 S.W.3d at 152; *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 740 (Tex. 1997); *see also* Tex. R. App. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested."), 46.3 ("If the remittitur is not timely filed, the court must reverse the trial court's judgment.").

### c. Past mental anguish[54]

As with Anderson's reputational damages, the Supreme Court concluded that although there was some evidence that Anderson suffered compensable past mental anguish, the $400,000 amount appeared to be excessive. *Anderson*, 550 S.W.3d at 620–21.

The Supreme Court recounted Anderson's testimony about his mental anguish, and we need not repeat it here. *Id.* at 620. We do note, however, that Anderson lost his subsequent job with Frank Kent, which had paid him $120,000 per year, in October 2013 "due to the trial because he was performing well enough to get promoted [but] closer to trial time, his performance started slipping." In short, Anderson's testimony was legally sufficient to show "a substantial disruption in his life" and "a high degree of mental pain." *Id.* And while this same evidence is also sufficient to show he suffered more than nominal mental-anguish damages, as with his reputational damages, the evidence is factually insufficient to support a $400,000 award.

The Supreme Court recognized that "each case is unique" but reiterated that "reasonable guideposts" govern any review of a mental-anguish award. *Id.* at 619. The Supreme Court pointed to cases upholding past mental-anguish awards of $20,000, $25,000, $35,000, and $50,000, stating that these cases involved similar or

---

[54]Our discussion of the mental-anguish damages is not as exhaustive as our reputational-damages discussion, but the same legal principles and our prior analysis apply here as if separately set out.

more egregious defamatory behavior. *Id.* at 619, 620 n.65; *see also Memon*, 401 S.W.3d at 419–20 (upholding $100,000 past mental-anguish award as reasonable compensation); *Cullum*, 399 S.W.3d at 184–86 (concluding $50,000 mental-anguish award not excessive); *Tranum*, 283 S.W.3d at 422 (concluding $250,000 mental-anguish award for slander not excessive); *Beaumont v. Basham*, 205 S.W.3d 608, 617–18 (Tex. App.—Waco 2006, pet. denied) (approving $100,000 past mental-anguish award based on plaintiff's testimony). Additionally, the Supreme Court recognized that it previously had affirmed a $150,000 mental-anguish award after a remittitur in a defamation case involving corroborating evidence of the plaintiff's mental-anguish testimony. *Anderson*, 550 S.W.3d at 619 (discussing award upheld in *Bunton v. Bentley*, 153 S.W.3d 50, 52–53 (Tex. 2004) (per curiam) (*Bentley III*)).

Durant, Cote, Deere, Rash, and Michelson request either a new trial on damages and liability or a remittitur down to an award of between $5,000 and $15,000. In the event of a remittitur, Anderson argues that an award of no less than $200,000 is justified by the evidence. Again, this range of requests and the discretionary nature of mental-anguish awards in defamation cases dulls the allure of remittitur. *See generally Anderson*, 550 S.W.3d at 619 ("Individuals experience mental anguish in myriad ways, so each case is unique. Nevertheless reasonable guideposts appear in our jurisprudence and instruct our analysis."). But because we have upheld Durant's, Cote's, Deere's, Rash's, and Michelson's defamation liability, we may not remand only unliquidated damages for a new trial. *See* Tex. R. App. P. 44.1(b).

90

The *Tranum* opinion is a helpful guidepost for our analysis of a non-excessive, mental-anguish award in the context of defamation. In that case, Jim Tranum hired David Broadway to be a new-car sales manager at Tranum Buick Pontiac GMC; Broadway was later promoted to general manager of Tranum Ford–Mercury. *Tranum*, 283 S.W.3d at 409. After the dealership began experiencing "cash flow problems," causing Tranum to tell Broadway to "fix it," Broadway began temporarily backdating deposits to give the appearance that a prior month had a higher balance. *Id.* at 410. There was some evidence that Tranum either knew Broadway was doing this or instructed him to do so. *Id.* at 419. The dealership's checks began to bounce, and Broadway eventually quit from the stress. *Id.* at 410. Tranum began accusing Broadway of "theft, embezzlement, and misappropriation" and told others that Broadway was a "thief" who stole money from the dealership. *Id.* 410, 419. Broadway was "continuously employed in the automobile industry since he resigned" but once the rumors began circulating, he was never able to return to an equivalent position. *Id.* at 420–21. He had to re-mortgage his home and sell all his other property to pay his debts. *Id.* at 421.

At trial on Broadway's subsequent slander per se claim against Tranum, Broadway testified that the fallout from Tranum's slander caused a substantial disruption in his life—depression, anxiety, debt, and divorce. *Id.* at 420. The court of appeals found that this evidence was factually sufficient to support the jury's $250,000 mental-anguish award for slander. *Id.* at 422. Anderson's testimony of his substantial

91

life disruption caused by the defamation was similar to Broadway's, and the defamation defendants' defamatory statements were similar to Tranum's. But in *Tranum*, Tranum sent his bookkeeper's affidavit (which she later repudiated) and his accountant's report about the state of the dealerships accounts to the district attorney. *Id.* at 410–11. The district attorney presented an indictment against Broadway for theft by deception and unlawful appropriation of funds to the grand jury; but the grand jury did not concur and returned a "no bill." *Id.* at 411. Broadway had to testify at the grand-jury proceeding, was financially ruined, and could not find work with anyone who knew him before he left Tranum's employ. *Id.* at 420–21. He blamed two of his four divorces on Tranum's actions. *Id.* at 420. Tranum's conduct was more egregious than Durant's, Cote's, Deere's, Rash's, or Michelson's. *See generally Anderson*, 550 S.W.3d at 623 (noting excessiveness of reputational-damage award indicated because $400,000 "substantially higher than amounts awarded in equally or more egregious cases").

*Bentley I* and its later disposition in *Bentley III*, which the Supreme Court discussed in determining the legal sufficiency of Anderson's past-mental-anguish damages, are also helpful guideposts for our analysis of a non-excessive, mental-anguish award in the context of defamation. *Anderson*, 550 S.W.3d at 619 (discussing *Bentley I*, 94 S.W.3d at 604–07 and *Bentley III*, 153 S.W.3d at 52–53). In *Bentley I*, a talk-radio host, Joe Ed Bunton, repeatedly commented on his weekly call-in show that an elected judge, Bascom Bentley, was corrupt. 94 S.W.3d at 567–74. Bentley sued

Bunton for defamation per se and testified to his past damages for mental anguish: "Bentley testified that the ordeal had cost him time, deprived him of sleep, caused him embarrassment in the community in which he had spent almost all of his life, disrupted his family, and distressed his children at school. The experience, he said, was the worst of his life." *Id.* at 606. The jury awarded Bentley $7 million in past-mental-anguish damages. *Id.* at 567, 576, 605. Although the Supreme Court concluded that the evidence was legally sufficient to support a mental-anguish award, it further concluded that insufficient evidence supported that amount. *Id.* at 604, 606–07. The Supreme Court remanded the case to the intermediate appellate court to "reconsider the excessiveness" of the award. *Id.* at 607. On remand, the court of appeals suggested a remittitur of $6,850,000, leaving an award of $150,000. *Bunton v. Bentley*, 176 S.W.3d 18, 20–21 (Tex. App.—Tyler 2003) (*Bentley II*), *rev'd on other grounds by Bentley III*, 153 S.W.3d at 54. The Supreme Court upheld *Bentley II*'s suggested remittitur. *Bentley III*, 153 S.W.3d at 52–53; *see also Anderson*, 550 S.W.3d at 619 (explaining holdings in *Bentley I* and *Bentley III*).

Based on the mental-anguish evidence here and these comparator cases, we conclude that the evidence was factually sufficient to support an award of $150,000, which would be fair and reasonable under the circumstances.[55] *See, e.g.*, *Bentley III*, 153 S.W.3d at 53; *cf. Tex. Dep't of Transp. v. Flores*, 576 S.W.3d 782, 801 (Tex. App.—El Paso 2019, pet. filed) (concluding evidence supported $100,000 mental-anguish

---

[55]Again, we disagree with Durant's attempted vicarious-liability argument.

award); *Beaumont*, 205 S.W.3d at 617–18 (same). We suggest a remittitur of $250,000, causing Anderson's mental-anguish award to be $150,000. *See* Tex. R. App. P. 46.3. If Anderson files this remittitur with the trial court clerk within fifteen days of our judgment and notifies the court of such, we will reform this portion of the trial court's judgment and, as reformed, affirm the damages award for past mental anguish. Otherwise, we will reverse the trial court's defamation judgment and remand for a new trial on Anderson's defamation claim against Durant, Cote, Deere, Rash, and Michelson. *See Rancho La Valencia*, 383 S.W.3d at 152.

### d. Settlement credit

Durant, Cote, Deere, Rash, and Michelson argue that the settlement credit of $84,999 must be applied to Anderson's upheld defamation damages.[56] Anderson asserts that because the trial court applied the credit to Anderson's defamation damages in the judgment, the credit need not be applied "a second time." But the Supreme Court vacated portions of Anderson's defamation recovery, and we have suggested a remittitur of Anderson's remaining defamation damages. Accordingly, the settlement credit would need to be applied to the reduced recovery upon remittitur. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.012(b). Anderson's remittitur should include the settlement credit so that his general damages recovery from

---

[56]We do not address this issue as to Maynard.

94

Durant, Cote, Deere, Rash, and Michelson for past reputational damage and past mental anguish is $215,001.[57]

## D. PROPORTIONATE RESPONSIBILITY

## 1. Apportionment[58]

Durant, Cote, Deere, Rash, and Michelson, as part of their sufficiency argument directed to the general damage awards, challenge the respective percentages of responsibility as found by the jury for any defamation recovery.[59] The totality of their argument is one sentence: "There also is legally and/or factually insufficient evidence to support the jury's apportionment of . . . fault to [Durant, Cote, Deere, Rash, or Michelson]. [Record citation to jury charge]."[60] The jury had wide latitude in allocating responsibility, and we may not substitute our judgment for the jury's. *See*

---

[57]$150,000 + $150,000 − $84,999 = $215,001. Accordingly, the total amount of our suggested remittitur is $584,999 from the awarded $800,000. Because we have held that Maynard was not liable based on his qualified privilege, his 1% responsibility must be borne by the remaining defendants in proportion to their responsibility as found by the jury.

[58]The jury found Anderson 0% responsible, Durant 85% responsible, Maynard 1% responsible, Cote 1% responsible, Michelson 1% responsible, Deere 5% responsible, and Rash 5% responsible. The jury found William Shapiro and Hedrick each 1% responsible; neither is a party to this appeal.

[59]Again, Maynard joins in this argument, but we have held that he was qualifiedly privileged to make the kickback statement; therefore, Maynard cannot be proportionately responsible for Anderson's defamation damages.

[60]They also include this sentence in their statements of their respective issue. But again, the circumstances of this case do not indicate that supplemental briefing would aid this court. *See St. John*, 2020 WL 593694, at *4.

Tex. Civ. Prac. & Rem. Code Ann. § 33.003; *Samco Props., Inc. v. Cheatham*, 977 S.W.2d 469, 478 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). These five defamation defendants do not point to any specific evidence that suggests a different percentage that would be more factually appropriate. Mimicking the brevity of their appellate argument on this issue, we conclude that the evidence we have discussed throughout this opinion is sufficient to support the jury's allocation of responsibility as between Durant, Cote, Deere, Rash, and Michelson. *See Hagins v. E-Z Mart Stores, Inc.*, 128 S.W.3d 383, 392 (Tex. App.—Texarkana 2004, no pet.); *Samco*, 977 S.W.2d at 478; *see also* Gregory J. Lensing, *Proportionate Responsibility and Contribution Before and After the Tort Reform of 2003*, 35 Tex. Tech L. Rev. 1125, 1133 (2004) ("The jury's precise apportionment of responsibility, as contrasted with its threshold findings of negligence and proximate cause, are virtually unappealable on sufficiency of the evidence grounds.").

## 2. Costs

Cote, Deere, Rash, and Michelson argue that based on their low percentages of responsibility for the defamation recovery, the trial court erred by ordering in the judgment that the defamation defendants were jointly and severally liable for $43,333.39 in recoverable court costs.[61] They argue that their respective liability for

---

[61]We do not address Maynard even though he joins in this argument. Because Maynard cannot be held liable for defamation based on his qualified privilege, Anderson was not a prevailing party as to Maynard and cannot recover costs from him. *See* Tex. R. Civ. P. 131.

court costs instead should have been limited to the responsibility percentages found by the jury. We initially reversed the costs award because we found that the defamation defendants were not liable for defamation; thus, Anderson was not a prevailing party. *Durant*, 2016 WL 552034, at *8; *see* Tex. R. Civ. P. 131. The Supreme Court did not specifically mention the costs issue as one that was remaining for our determination on remand, but the court did express that it did not intend "to limit the scope of remand except as to the issues decided in this opinion." *Anderson*, 550 S.W.3d at 624 & n.101. We will address the issue.

As a successful party, Anderson was entitled to recover "all costs incurred." Tex. R. Civ. P. 131. We review a trial court's cost assessment for an abuse of discretion. *See Mitchell v. Bank of Am., N.A.*, 156 S.W.3d 622, 630 (Tex. App.—Dallas 2004, pet. denied); *Niemeyer v. Tana Oil & Gas Corp.*, 39 S.W.3d 380, 389–90 (Tex. App.—Austin 2001, pet. denied) (op. on reh'g); *Seelback v. Clubb*, 7 S.W.3d 749, 764 (Tex. App.—Texarkana 1999, pet. denied). The plain language of Rule 131 does not expressly require an allocation of costs between unsuccessful parties. *See Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 534 S.W.3d 558, 597 (Tex. App.—San Antonio 2017) (discussing *Furr's Supermarkets, Inc. v. Bethune*, 53 S.W.3d 375, 378 (Tex. 2001)), *aff'd on other grounds*, No. 17-0736, 2020 WL 499243 (Tex. Jan. 31, 2020). The trial court had the discretion to award all costs against any of the unsuccessful defendants or against all of them, which the trial court did by taxing the costs jointly and severally. *See id.*

97

We see no abuse of discretion in the trial court's nonproportionate taxation of costs among Durant, Cote, Deere, Rash, and Michelson given that each was an active pretrial and trial participant and given that each was found liable for defamation. *Cf., e.g.*, *Gragson v. M.E.&E. Welding & Fabrication, Inc.*, No. 06-00-00044-CV, 2001 WL 1190087, at *8–9 (Tex. App.—Texarkana Oct. 10, 2001, pets. denied) (not designated for publication) (concluding joint and several cost assessment was abuse of discretion based on one defendant's "bare minimum" participation pretrial and at trial); *Tex. Dep't of Public Safety v. Staples*, 882 S.W.2d 431, 432–33 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (concluding because jury found plaintiff A 90% responsible, plaintiff B not responsible, and defendants 10% responsible for plaintiff B's personal injuries, plaintiff B's costs could not be taxed 100% against defendants but must be taxed 90% against plaintiff A and 10% against defendants); *Gasperson v. Madill Nat'l Bank*, 455 S.W.2d 381, 399 (Tex. App.—Fort Worth 1970, writ ref'd n.r.e.) (considering length of trial and one unsuccessful defendant's minor interest in "overall controversy" to conclude costs should not have been taxed jointly and severally against both defendants).

## V. CONCLUSION

Regarding fraudulent inducement, the jury charge did not authorize an invalid theory of liability and did not impermissibly instruct the jury on an invalid measure of damages. The evidence was factually sufficient to show an enforceable promise. And the evidence was legally and factually sufficient to show a material misrepresentation

and justifiable reliance even though Anderson was an at-will employee.  Legally and factually sufficient evidence supported the jury's awarded benefit-of-the-bargain damages.  Specifically, Durant's expert and Anderson's expert, whose testimony was admissible, authorized damages within a range that included the amount found by the jury.  These damages were correctly calculated based on when they were incurred—January 2012.

Regarding defamation, there was no jury-charge error, including the instruction to determine actual malice by a preponderance of the evidence.  The evidence was legally and factually sufficient to show the defamation defendants published a specific, factual statement to a third party, resulting in damages to Anderson.  Although Durant and Cote were qualifiedly privileged to make the kickback statements as found by the jury, the evidence sufficiently showed (under either a clear-and-convincing or preponderance standard) that Durant and Cote acted with actual malice, which vitiates their privilege.  Maynard established his qualified privilege as a matter of law; thus, the jury's adverse finding was supported by legally insufficient evidence.  Anderson did not sufficiently prove, as he did with Durant and Cote, that Maynard acted with actual malice; thus, Maynard is entitled to a take-nothing judgment on Anderson's defamation claim against him.

Because the nonprivileged kickback statements were defamatory per se, the fact of Anderson's damages—causation—is presumed.  Here, the evidence was legally and factually sufficient to show Anderson was entitled to more than nominal general

damages. But because the evidence is factually insufficient to support the awarded amounts for past reputational damages and past mental-anguish damages, we suggest a remittitur, which must be additionally reduced by the settlement credit. Finally, the trial court's joint and several costs award in the judgment was not an abuse of discretion under Rule 131.

Accordingly, we sustain Durant and the Granbury dealerships' remand issues 5.c and 5.d; Cote, Deere, Rash, and Michelson's remand issues 3.c and 3.d; and Maynard's remand issue 3.[62] All other issues are overruled.

We affirm the trial court's judgment as to Durant's and the Granbury dealerships' liability for fraudulent inducement and as to Durant's, Cote's, Deere's, Rash's, and Michelson's liability for defamation. We reverse and render a take-nothing judgment on Anderson's defamation claim against Maynard. We affirm the fraudulent-inducement damages award but suggest a remittitur regarding Anderson's remaining general defamation damages. Upon timely remittitur, we will modify the amount of defamation damages awarded in the trial court's judgment and affirm the awards as modified. If Anderson does not timely file the remittitur, we will reverse the trial court's judgment as to Anderson's defamation claim against Durant, Cote, Deere, Rash, and Michelson and will remand for a new trial on liability and on

---

[62]Based on our qualified-privilege ruling regarding Maynard, we need only sustain Maynard's issue 3. *See* Tex. R. App. P. 47.1. And in the interest of clarity, we note that in Cote, Deere, Rash, and Michelson's brief on remand, their fourth issue is numbered as their fifth issue. They did not include a fourth issue, skipping from issue three to issue five.

Anderson's damages for past damage to his reputation and past mental anguish.[63]  *See*

Tex. R. App. P. 44.1(b); *Rancho La Valencia*, 383 S.W.3d at 151–52.

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered:  March 19, 2020

---

[63]The remanded damages are limited to those damages that the Supreme Court concluded were supported by legally sufficient evidence.  *See Ford Motor Co. v. Cooper*, 125 S.W.3d 794, 804 (Tex. App.—Texarkana 2004, no pet.) ("The general rule is, where an appellate court finds the evidence legally insufficient to support a damages verdict, the court should reverse and render a take-nothing judgment as to that amount.").